**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LYLE MENENDEZ,
             *Petitioner-Appellant,*

v.

C. A. TERHUNE, in his capacity as
head of the California Department
of Corrections,
             *Respondent-Appellee.*

No. 03-55863

D.C. No.
CV-00-02359-MLR

---

ERIK GALEN MENENDEZ,
             *Petitioner-Appellant,*

v.

GLEN A. MUELLER; ATTORNEY
GENERAL OF THE STATE OF
CALIFORNIA,
             *Respondents-Appellees.*

No. 03-56023

D.C. No.
CV-99-08552-R

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 17, 2005—Pasadena, California

Filed September 7, 2005

Before: Alex Kozinski, Stephen S. Trott, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Trott

12465

## COUNSEL

Cliff Gardner, San Francisco, California, for the petitioner-appellant.

Lawrence A. Gibbs, Berkeley, California, for the petitioner-appellant.

Kenneth C. Byrne, Supervising Deputy Attorney General, Los Angeles, California, for the respondents-appellees.

## OPINION

TROTT, Circuit Judge:

## INTRODUCTION

In this consolidated appeal, Lyle and Erik Menendez[1]

[1]We use the first names of the Petitioners to avoid confusion.

appeal the district court's denial of their petitions for habeas corpus. Pursuant to 28 U.S.C. § 2253(c), we granted a certificate of appealability on five issues: (1) whether the admission of a tape-recorded session between Petitioners and their therapist violated Petitioners' constitutional due process rights as elaborated in *Ake v. Oklahoma*, 470 U.S. 68 (1985); (2) whether the trial court's decision not to instruct the jury on imperfect self-defense violated Petitioners' rights to due process; (3) whether the exclusion of certain evidence violated Petitioners' due process rights in that the trial court required that they first lay a foundation, which as a logical matter could only be done if they testified; (4) whether the exclusion of certain lay and expert testimony violated Petitioners' due process rights and Sixth Amendment right to present a defense; and (5) whether Lyle's due process rights were violated when the prosecutor commented on the lack of evidence regarding abuse and the lack of experts, both of which the prosecutor had successfully moved to exclude.[2]

We have jurisdiction pursuant to 28 U.S.C. § 2253; we reject all five contentions; and we affirm.

## BACKGROUND

Erik and Lyle shot and killed their parents, Jose and Kitty Menendez, in the family's Beverly Hills home on August 20, 1989. The theory of the prosecution supporting charges of murder was that these killings were motivated by greed and the brothers' desire to acquire by early inheritance their parents' considerable wealth. However, after abandoning a story cooked-up for police investigators that the Mafia had killed their parents, Erik and Lyle claimed at trial that the killings

---

[2]Erik made this fifth argument belatedly, and he appeals the district court's denial of his request for leave to amend to add this claim. Because we reject the argument on the merits, we need not decide whether the district court abused its discretion by denying Erik's request for leave to amend.

were the result of years of physical, sexual, and psychological abuse, and thus not murder, but only manslaughter.

## A. The Pre-Killing Planning, the Killings, and the Post-Killing Cover-Up

Erik testified that a few days before the murders, Jose told Erik that Erik would be required to spend several nights a week at home while attending college at UCLA. This, Erik testified, shattered his dream of going away to college and "getting away from [his] father." Erik testified also that five days before the murders, as a result of this news from his father, Erik told Lyle, who was home from the East Coast for the summer, that their father had been sexually abusing Erik for years.

On August 15, 1989, Lyle allegedly confronted Jose about the abuse while Erik was out of the house. Lyle recounted the confrontation to Erik, who testified Lyle told him that Jose said "go to Princeton, forget the conversation ever happened, and just not ruin his [Lyle's] life over this, don't get involved over this." When Lyle responded to Jose, "No, it's going to stop," Jose said "something along the lines of: 'You've made your decision and Erik's made his and now he [Jose] had to make his.' " After the confrontation, Jose left for a business trip, and when he returned, he allegedly went to Erik's bedroom and screamed "I warned you never to tell Lyle. I told you never to tell Lyle. Its [sic] all your fault. Now, Lyle's going to tell everyone and I'm not going to let that happen. I can't believe you did this." As a result of this confrontation and years of threats by Jose, Erik testified he thought his parents would kill him.

Erik and Lyle armed themselves on August 18, 1989, two days before they would kill their parents. On that day, Lyle and Erik, then ages 21 and 18, respectively, tried to purchase guns at several different stores, the first in Los Angeles. After learning that handguns could not be purchased immediately,

they drove from Los Angeles to San Diego, where the second store asked for identification. After quietly discussing the identification issue, the brothers decided that the store clerk would probably be suspicious that they did not promptly provide identification when asked. So, they left that store, and went to the third and final store. There, they bought two shotguns using false identification and providing non-existent addresses. When the store clerk asked why the address on his identification did not match the address he provided, Erik lied, telling the clerk that he had recently moved.

After making their secret purchase, Erik and Lyle drove back to Los Angeles, where they decided to practice firing their newly-purchased shotguns. They went to a firing range, but were turned away because the range did not allow shotguns. Additionally, having been told that the birdshot ammunition they had loaded into their new guns was "useless" for "stopping" a person, Erik and Lyle purchased buckshot ammunition, ammunition that presumably would "stop" a person.

The day before the murders, Jose, Kitty, Erik, and Lyle went on a planned fishing trip together. Despite their alleged fear of their parents, Erik and Lyle left their new shotguns at home because they were too large to conceal. The brothers and parents had very little interaction on this trip. The trip was uneventful, however, and the family returned home late that evening. Erik testified that Jose came to Erik's room that night and pounded on the door, but Erik refused to open it because he was afraid. Jose left.

The next morning was August 20, the day of the murders. Lyle called a friend, Perry Berman, and talked about getting together that evening. Berman made plans with Lyle to meet the brothers at the "Taste of L.A." food festival after Erik and Lyle went to see "Batman," a movie Lyle said would end around 9:00 or 9:30 that evening. Erik and Lyle never went

to see the movie, and they never turned up at the festival to meet Berman.

Erik testified that Lyle had an argument with Jose and Kitty about the brothers' plan to go out for the evening, following which Jose told Erik to go to his room. Allegedly fearing that his father wanted to have sex with him, Erik nevertheless complied and went up the stairs, but he lingered to listen and heard Lyle tell Jose, "You're not going to touch Erik. You're not going to touch my little brother. You're never going to touch him again." According to Erik, Jose and Kitty then went into the den and closed the doors.

Lyle went up the stairs, where Erik testified that he told Lyle, "I'm not going to my room tonight. I can't let him come to my room. I can't let this happen." He further testified that "[Lyle] told me not to worry about that." Lyle, according to Erik's testimony, was pale and shaking, when Lyle said, "It's happening now. They were waiting for me to get home and it's happening now."

Jose and Kitty remained in the den with the television set on. The record is unclear as to how much time elapsed between this final confrontation and the murders, but it was enough time for Erik and Lyle to separate. Erik went to his bedroom where he retrieved his new shotgun from the closet. He then went back downstairs and out to the car. There, he removed the birdshot ammunition from his gun and replaced it with buckshot. Lyle rejoined him at the car where Lyle, too, began loading his shotgun.

Around 10:00 p.m., Erik and Lyle's parents were unarmed and in the den, watching television and eating. Lyle and Erik burst through the doors of the den and fired thirteen to fifteen shotgun blasts at their parents. Erik testified that he thought his father was standing, but said also, "As soon as I burst through the doors, as soon as I saw them, I just immediately started firing. I didn't stop and look around. I just started fir-

ing." Before the massacre was over, Erik and Lyle left the house and went to the car where Lyle reloaded. They returned to the house, where Lyle fired one more shot. The final shot, which was apparently fired while Kitty was still alive, was administered while the muzzle of the shotgun was in contact with her left cheek. Jose also had a contact wound to his head.

Jose and Kitty died at the scene from multiple gunshot wounds — four shots to Jose and nine shots to Kitty. Jose was found with gunshot wounds to his legs that were inflicted after death.

While their parents lay dead on the floor of the den, Lyle and Erik began extensive cover-up efforts. First, they collected the expended shotgun shells, concerned that their fingerprints might be on them, and they left the house. Then, to support the story Lyle previously told Perry Berman, the brothers drove to the movie theater and purchased alibi tickets for "Batman." The brothers had to discard the tickets after noticing that the tickets were time-stamped and would not provide an adequate alibi. Next, Erik and Lyle stopped at a gas station, where they dumped the shotgun shells, their bloody clothes, and their bloody shoes in a trash can.

Around 11:00 p.m., an excited-sounding Lyle called Berman and falsely told him that he and Erik had gotten lost on the way to the festival, and that by the time they arrived there, the festival was closed. In an apparent effort to fabricate a second alibi, Lyle suggested to Berman that they meet at a restaurant in Beverly Hills instead. A few minutes later, however, Lyle called back and asked Berman to meet at the Menendez home instead. Rather than meet at the home, Berman agreed to wait so that Lyle and Erik could go home to get Erik's fake I.D. Of course, after returning home, Erik and Lyle "discovered" their parents' dead bodies and did not show up at the restaurant to meet Berman.

At that point, Lyle called 911 and emotionally told the operator, "someone killed my parents." He said that he had

just come home and discovered their bodies. Erik could be heard screaming and crying in the background. Continuing the charade when the police arrived, Lyle and Erik ran from the home toward the officers, screaming.

During the ensuing investigation, Lyle and Erik both falsely told officers that they were elsewhere at the time of the killings. Lyle went so far as to tell the officers he thought the killings might be "business-related," meaning a Mafia hit.

We note here that the gory scene of the slaughter of Jose and Kitty Menendez is consistent with the notion that the killings were carried out with the false Mafia story already in mind. It appears from the record that the shotgun overkill administered by Erik and Lyle was designed to simulate a gangland hit in order to enable the brothers to deceive the police and to point them in the wrong direction.

After the initial police interview, Erik and Lyle asked if they could return to the den to recover their tennis rackets.

Picking up on Lyle's suggestion that the slaughter might be Mafia-related, the police began to investigate that lead. To make the lie more believable, Lyle immediately hired bodyguards to "protect" him 24 hours a day, telling his bodyguard that either the Columbian Cartel or the Mafia was responsible for his parents' murders. He told his girlfriend the same story. But Lyle terminated the "round the clock" arrangement after a week, falsely asserting that a "deal" had been reached with the Mafia and he was no longer in danger. Nonetheless, Lyle hired a bodyguard for his "protection" during his Fall, 1989 semester at Princeton.

Erik, too, continued the "Mafia-killing" pretense: In September or October of 1989, he told Berman that his parents' murders were "business-related." Erik went so far as to name names, telling Berman that the murders involved a man

named Noel Bloom, a man who previously had business problems with Jose.

While the police were attempting to solve the crime, Erik and Lyle were concerning themselves with the considerable wealth their parents had left behind. Jose's life insurance left Lyle and Erik with more than $300,000 each, but other valuable assets remained undistributed. At the time of his death, Jose was earning over a million dollars a year, and his combined property and stock assets amounted to more than seven million dollars. The brothers knew that Jose had a will, but questions remained at the time as to the location of the will and whether Jose had written more than one.

Jose's 1981 will, which left everything to Erik and Lyle, was not immediately recovered. The brothers, however, had reason to fear that Jose might have written a new will, one that would leave them nothing. Erik testified that his mother told him that Jose had disinherited Erik. The day after the murders, Erik and Lyle spoke with Randolph Wright, an attorney and family friend, about probating Jose's will. (During this meeting, Erik again mentioned he thought the killings were Mafia-related.)

Lyle told Wright that he thought Jose might have changed his will and that the new will might be on the family computer. The other possible location of a new will was a family safe. Lyle retrieved the safe, and it was brought to Wright's home, where it was kept in a spare bedroom. Erik spent two nights in that bedroom with the safe, and when it was opened, Lyle allowed no one but Erik to be present. After opening the safe in private, Lyle told family and friends that he and Erik had found nothing in the safe.

Some time later, three files on the computer, entitled "Will," "Erik," and "Lyle," were discovered. These files, however, were mysteriously unrecoverable. A computer expert named Howard Witkin testified at trial that Lyle had

called him in on an "emergency" computer problem. Witkin found the location of the files, but no information. Lyle asked Witkin to be sure to completely erase the disk, claiming that he was selling the computer and wanted to make sure that no financial information could be discovered. Soon thereafter, the family found the 1981 will — now the only will — which left everything to Lyle and Erik.

With the knowledge that they were to inherit millions, Lyle and Erik began shopping days after the murders. Lyle started by purchasing three Rolex watches and two money clips, as well as a new Porsche 911 Carrera Cabriolet. Erik bought a Jeep Wrangler, and both brothers bought houses, clothes, and businesses.

Their final pre-trial attempt to escape punishment came after they were arrested. Two witnesses testified that they had been asked to fabricate evidence. Lyle asked one witness, Brian Amir Eslaminia, to lie and testify that the day before the murders, Lyle and Erik said they needed a handgun for protection. The other witness, Lyle's girlfriend, Jamie Pisarcik, testified that Lyle asked her to allege that Jose had raped her.

## B.   The Therapy Sessions

In 1988, prior to the murders, Erik had been charged with two residential burglaries in the Calabasas area of Los Angeles County. In connection with these charges, both brothers acquired the services of an attorney, Gerald Chaleff. Formal charges arising from these burglaries were filed against Erik in Juvenile Court. Lyle was not charged.

For the purpose of pursuing diversion from the court system pursuant to section 654 of the California Welfare and Institutions Code, Chaleff suggested to Erik and Jose that they find a psychologist. Chaleff testified in the instant case that he thought, "we were going to need — that counseling or psychiatric therapy or psychological therapy was part of our defense

for that case, and that we needed that to show the court that he was attempting to deal with whatever led to the burglaries." The family located Dr. Jerome Oziel for this purpose. In January of 1989, Dr. Oziel prepared a report regarding his therapeutic relationship with and evaluation of Erik, which Chaleff submitted to the Juvenile Court in order successfully to secure Erik's diversion for one year and the eventual dismissal of all charges.

Chaleff reentered the lives of the Menendez brothers within days of the killings. On August 21, 1989, Chaleff advised the police that he would be "acting on their behalf as legal counsel." However, unbeknownst to Chaleff and on their own initiative, the Menendez brothers resumed meeting on a professional basis with Dr. Oziel. On their own, they met with Dr. Oziel during September, October, and November of 1989. Chaleff testified that he was unaware of Dr. Oziel's continuing involvement in the brothers' lives until December of 1989, about two months after the brothers had resumed their therapy sessions.

During their 1989 sessions with Dr. Oziel, neither brother immediately confessed to their roles in their parents' deaths. Eventually, however, the truth got the best of Erik. After several sessions, he called Dr. Oziel on October 30, 1989, and said that he urgently needed to speak with him. Dr. Oziel already suspected that Lyle and Erik had committed the crimes, so when Erik called, Dr. Oziel became concerned for his safety. He had his business associate and mistress, Judalon Smyth, eavesdrop on the conversation. As it turned out, Dr. Oziel was right about both the murders and his own safety.

Erik met with Dr. Oziel the next day and confessed to the crimes in detail. Lyle did not yet know that Erik had confessed, and Dr. Oziel worried what Lyle would do when he learned of Erik's confession. To gauge Lyle's reaction, Dr. Oziel called Lyle and asked him to come to the office. When Lyle arrived, he was told of the confession, and he began yell-

ing at Erik in Dr. Oziel's presence: "I can't believe you did this! I can't believe you told him! I don't even have a brother now! I could get rid of you for this! Now I hope you know what we are going to do. I hope you realize what we are going to have to do. We've got to kill him and anyone associated to him."

Dr. Oziel was now not only concerned for his family's and his own safety, but also was worried about how to proceed. Unsure as to his ethical obligations as a therapist, he consulted several people for advice without revealing what had happened. Ultimately, he decided that the best way to protect himself was to continue to meet with the brothers and convince them that he was an ally. He began taping the sessions for his safety, threatening that the tapes would be released to the police if anything happened to him.

In early December of 1989, Erik and Lyle gave Dr. Oziel permission to consult Chaleff. At that juncture, Chaleff still had no knowledge whatsoever that the brothers had been meeting with Dr. Oziel on a professional basis. Chaleff added that he had not discussed with Dr. Oziel anything about participating in a "criminal defense aspect of the case," and that he had not discussed Dr. Oziel at all with either Erik or Lyle.

Chaleff and Dr. Oziel met on December 8, 1989, and Dr. Oziel told Chaleff that he planned to continue the therapy sessions. At some point after this meeting, Chaleff decided that continuing therapy could be helpful because "if there was a trial . . . this might be good for the penalty phase, if there ever was one." Chaleff explained the situation as follows:

> Q: [By Defense Counsel] And was some arrangement made for you to meet at your house the next day? That would have been Saturday, December 9th.

> A: [Chaleff] Yes.

Q: And can you tell me what the results of that meeting were.

A: Well, Dr. Oziel came over [to] my house and we had a conversation, and then the result was that we were going to have a meeting with Lyle and Erik and Dr. Oziel and myself as soon as we could.

Q: What was the information that Dr. Oziel gave you at that point, that is, on the 9th?

A: In total? What — he told me a lot of things.

Q: Well, did he tell you that the boys had made a statement to him in reference to the homicides?

A: Yes.

Q: *And did he — was there some discussion between the two of you as to whether therapy should continue at that point, given what he already had learned from them?*

A: *I think he told me that they were going to continue therapy, and I don't know if I agreed or not.* But I didn't say no. I mean, I don't have a real strong recollection of that. But I know we discussed it.

Q: And at some point in time, either December 8th or some other day, do you have a recollection of deciding as their lawyer that therapy with Dr. Oziel should continue for the purpose of, perhaps, use of the material he was developing in the event that a case ever got filed against him?

A: At some point I decided that continuing therapy with Dr. Oziel would be beneficial, could be beneficial, if he ever got arrested.

Q: And could you just elaborate on how you thought his therapy sessions were going to be of use to you.

A: Yes. First thought that came to my mind — and I guess that's usually because I'm a pessimist about things — if there was a trial, that he could be convicted, and this might be good for the penalty phase, if there ever was one.

Q: Okay. And do you recall conveying your decision to the Menendez brothers at some point?

A: Yes.

Q: And do you remember when that happened?

A: That happened on the meeting we all had together on the 11th.

Q: And after that meeting on the 11th, were you made aware of the fact, after that date, that Dr. Oziel had tape-recorded that session?

A: Yes.

Q: And did you ask for a copy of that tape at that point, that is, some time in December?

A: I wasn't made aware of it in December.

Q: When were you made aware?

A: After they were arrested.

Q: That there was actually a tape-recording of the session, of that particular session?

A: Yes.

(emphasis added).

During the December 11, 1989 session, Erik and Lyle talked about their relationships with their parents and about the pressures they felt growing up — the fact that they loved their parents but found their father too demanding, and that their mother, who had contemplated suicide, was unhappy. They spoke candidly about the murders, discussing in some detail their thoughts and plans leading up to them. Particularly incriminating were statements about the reasons for and plans to kill Jose and Kitty:

> [Erik]: Well, we, we were, we were doing almost, in my mom's case, something that, that first of all, there was, there was no way, never could she live without my father.
>
> . . . .
>
> [Lyle]: That was something that we had to really, it was a big thing holding us back. Ah, from killing my father was that we thought that we would just kill dad, and eliminate the problem.
>
> . . . .
>
> [Lyle]: And ah, so ah, for my, for my mother's sake, I, I thought that ah, we did it, it was, we had to come like I was saying before, we had to make a decision. It was one of the harder ones, and it was a separate issue. (unintel.). He's the reason. My father should be killed. There's no question. What he's doing is, he's impossible to live with for myself and for . . . .
>
> . . . .
>
> [Lyle]: But I still don't think it had anything to do with, killing him had nothing to do with us. It had to

do with me realizing a number of things that all culminated, which was, and could have culminated at any point. And it was just a question of Erik and I getting together, and somebody bringing it up, and us realizing the value in it.

. . . .

[Lyle]: There was no way I was gonna make a decision to kill my mother without Erik's consent. I was going, I didn't even wanna influence him in that issue. I just let him sleep on it for a couple days. Cause ah, I did . . . I, I, I'm in a very ah, good position to influence Erik on a lot of things. Because he knows that I care, and a whole number of issues. That I can talk eloquently or whatever. And ah, but when it came to that issue, I wanted nothing to do with it. It had to be his own personal issue. If he felt the same way I did about killing mom.

This tape came to the attention of the police after Dr. Oziel's relationship with Judalon Smyth ended. At that point, Smyth approached Beverly Hills police and told them what she knew about the murders. On March 8, 1989, a warrant was served at Dr. Oziel's home, and the taped sessions were recovered. This tape provided the prosecution with additional evidence that the murders had been committed in a deliberate, premeditated fashion.

## C. The Trials

Lyle and Erik were charged in Los Angeles County Superior Court with two counts of murder while lying in wait and one count of conspiracy to commit murder. The State sought the death penalty against both brothers and was forced to try the brothers twice, when each of the first juries — one for each defendant — was unable to reach a verdict.

### 1.  The First Trial

Our concern in this case is only with the rulings in the second trial. However, Petitioners make much of the differences in the two trials in an attempt to show that they received an unfair second trial. Accordingly, we outline here the major differences between the two trials.

During the first trial, Lyle and Erik were tried jointly with two separate juries. The defense theory was not that Jose and Kitty had been killed by the Mafia over a business deal gone sour, but as an act of "imperfect self-defense," a theory available to California defendants who have a genuine, albeit unreasonable, fear of imminent death or great bodily injury. *In re Christian S.*, 7 Cal. 4th 768, 771 (1994). A defendant who kills with this genuine but unreasonable fear can be found guilty of no more than manslaughter. *Id.*

In an effort to support this theory at the first trial, both Lyle and Erik testified about their fear of their deceased parents due to a lifelong pattern of abuse. Lyle, who did not take the stand at the second trial, testified that his father had sexually molested him when Lyle was between the ages of six and eight. Additionally, he testified that both his mother and father had been physically and psychologically abusive to his brother and him throughout their lives.

Among the many other differences between the two trials was the prosecution's failure during the first trial to object to the introduction of much defense evidence that would be excluded in the second trial. Also, the judge gave the juries in the first trial an instruction on imperfect self-defense (CALJIC No. 5.17).[3] This first trial resulted in two hung

---

[3]The 1995 revision of CALJIC No. 5.17, a modified version of which was requested at trial, provided as follows:

> A person, who kills another person in the actual but unreasonable
> belief in the necessity to defend against imminent peril to life or

juries. Neither jury was able to agree on a degree of homicide, landing all over the board with votes for first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter.

## 2.   The Second Trial

As with the first trial, the defendants admitted killing their parents, and again disputed only the kind of homicide of which they were guilty. The new prosecution team and the defense were both armed with lessons learned in the first trial, and as a result, the second trial differed from the first. This time, (1) the cases were tried before a single jury, (2) the prosecution raised new successful objections to the introduction of some defense evidence, and (3) though the theory of defense remained the same, defense trial tactics changed as well.

For example, Lyle opted not to testify in his own defense during the second trial, though Erik again took the stand and testified about his and Lyle's alleged fear of their parents. Because of this decision not to testify, Lyle presented no evidence of his alleged fear of his parents at the time of the murders. Consequently, the trial court ruled that Lyle failed to lay a foundation for the introduction of testimony, admitted dur-

---

great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.

As used in this instruction, an "imminent" [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

[However, this principle is not available, and malice aforethought is not negated, if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his] [her] adversary's [use of force], [attack] [or] [pursuit].]

(brackets in original).

ing the first trial, which was offered to support his theory that he killed in an honest, but unreasonable belief in the need for self-defense.

In addition, the prosecution successfully argued that some so-called "source evidence," evidence that would have explained why the brothers might have had a fear of their parents, was cumulative or lacking in foundation. These witnesses included family and friends who would have testified to specific instances of abuse by Kitty and Jose. The evidence also included experts who would have explained what effect the abuse might have had on Lyle and Erik. The trial court excluded or limited some of this testimony as either lacking foundation or because it was cumulative.

This time, the jury found both Lyle and Erik guilty of first degree, premeditated murder. Moreover, pursuant to California Penal Code sections 190.2(a)(3) and (15), the jury found true the special circumstance that Lyle and Erik committed multiple murders while lying in wait. The defendants were sentenced to life imprisonment without the possibility of parole.

The California Court of Appeal affirmed the judgments of conviction, and the California Supreme Court denied review. Lyle filed a habeas petition with the California Supreme Court, which was denied. Both defendants filed federal habeas petitions, which were also denied.

## ANALYSIS

### A. Standard of Review

We review the district court's denial of a writ of habeas corpus de novo. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). Because petitioners' petitions were filed after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. *Lindh v. Murphy*, 521 U.S. 320,

327 (1997); *Pirtle v. Morgan*, 313 F.3d 1160, 1166 (9th Cir. 2002). Under the AEDPA, we may not grant relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This is a " 'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions [on the merits] be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh*, 521 U.S. at 333 n.7 (1997)). A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. However, in cases where we must decide a constitutional issue not adjudicated on the merits in state court, "we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." *Pirtle*, 313 F.3d at 1167.

## B. Admission of the Tape-Recorded Therapy Session

Petitioners argue that the admission of the December 11 tape of their session with Dr. Oziel violated their right to due process under the Fifth and Fourteenth Amendments. Petitioners concede that the state courts' adverse determinations on their claims of attorney-client and psychotherapist-patient privilege cannot be relitigated here because that determination is a question of state law, which cannot form the basis of federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).[4] Thus, our review is limited to the constitutional question posed: whether the admission of the tape violated Petitioners' rights under the due process clauses of the Fifth and Fourteenth Amendment as interpreted in *Ake*.

Petitioners urge us to conclude that the Due Process Clause of the Fourteenth Amendment, as interpreted by the Supreme Court in *Ake*, includes the right of defense counsel to hire a psychotherapist to aid not just with the question of sanity, but to assist in all aspects involving the mental condition of the defendant, and that any communications made to the psychotherapist in this connection be kept confidential.

As the State concedes, the state court did not reach the merits of Petitioners' constitutional claim on this issue. Consequently, the AEDPA's deferential standard of review "to purely legal issues and mixed questions of law and fact" does not apply, and we review this claim de novo. *Pirtle v. Morgan*, 313 F.3d at 1167-68.[5] Nevertheless, we reject this claim on its merits because *Ake* is inapplicable.

---

[4]The Court of Appeal determined on the record that (1) the December 11 session was not covered by the state attorney-client privilege because it was not a confidential communication between a client and an attorney, and (2) the state psychotherapist privilege had been waived.

[5]We ordered supplemental briefing on the issue because we questioned whether this precise due process claim was exhausted, i.e., "fully and fairly presented" to the state courts. *See Baldwin v. Reese*, 541 U.S. 27,

In *Ake*, after the defendant exhibited bizarre behavior during his arraignment for murder, the trial judge sua sponte ordered that he be evaluated by a psychiatrist. 470 U.S. at 71. As a result, Ake was committed to a state hospital to inquire about his present sanity, i.e., his competency to stand trial. *Id.* Later, at a pretrial conference, Ake's attorney informed the court that he would rely on an insanity defense, and counsel asked, at state expense, for the assistance of a psychiatrist and evaluation of Ake's sanity at the time of the offense. *Id.* at 72. The trial court denied the request. *Id.* As a result of this decision, and although Ake's sole defense at trial was insanity, there was no expert testimony on either side of this central issue. *Id.*

[1] The issue for the Supreme Court to decide was "whether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question." *Id.* at 70. Concluding that an indigent defendant's right to a fair opportunity to present his defense includes access to psychiatric assistance with respect to an insanity defense, the Court ruled in Ake's favor:

> We . . . hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

29 (2004). Though we continue to question whether this claim was indeed exhausted, because the State has not argued that the claim is unexhausted, we proceed to the claim on its merits. *Cf. Simmons v. Blodgett*, 110 F.3d 39, 41 (9th Cir. 1997) (holding under pre-AEDPA law that "[b]ecause exhaustion is not jurisdictional, we have no sua sponte obligation to [resolve the exhaustion question]").

*Id.* at 83. As precedent for this holding, the Court looked to *Gideon v. Wainwright*, 372 U.S. 335, 339 (1963) (holding that states must provide an indigent defendant, at state expense, assistance of counsel at criminal trial); *Griffin v. Illinois*, 351 U.S. 12, 19-20 (1956) (plurality opinion) (holding that due process and equal protection require that the state provide an indigent defendant a free copy of the trial transcript if the transcript is necessary to a decision on the merits of the appeal); *Burns v. Ohio*, 360 U.S. 252, 257-58 (1959) (holding that an indigent defendant may not be required to pay a fee before filing a notice of appeal); and *Douglas v. California*, 372 U.S. 353, 357 (1963) (holding that an indigent defendant is entitled to assistance of counsel on his first direct appeal as of right). *Ake*, 470 U.S. at 76 (discussing cases).

We note that neither Erik's nor Lyle's sanity at the time of the offense was ever seriously contemplated to be a part of the defense or a significant factor at trial. In fact, no question of sanity or diminished capacity was ever argued to the state trial courts. Moreover, neither Petitioners nor Chaleff ever hired Dr. Oziel to provide any assistance whatsoever on these or any other issues. Dr. Oziel's role at the time of the disputed December 11, 1989 tape was to continue with ongoing therapy. After extensive hearings on the issue, the trial court rendered findings of fact that are wholly consistent with the evidentiary record:

> The Court finds that the tape-recorded session of December 11 was for the purpose of therapy. This finding is based upon the evidence presented to this Court. . . .

> The Court further finds that this session would have occurred whether or not the [Petitioners] had sought the advice of [attorney] Chaleff and regardless of what his advice had been in this matter. That the session occurred and what was said during the session were the product of the therapeutic relation-

ship between the [Petitioners] and [Dr.] Oziel and not the product of the relationship the [Petitioners] had with [attorney] Chaleff.

The Court further finds that the [Petitioners] and [attorney] Chaleff contemplated that a record of this therapy session could possibly be of use to them in defense of a criminal charge if one was later filed against the [Petitioners], but that this was not the motivation for the session.

The record demonstrates that Dr. Oziel's services were not sought by counsel. Rather, the brothers initially sought out Dr. Oziel's therapeutic sessions without Chaleff's knowledge, and Chaleff did not even know that the brothers were seeing Dr. Oziel until Dr. Oziel contacted Chaleff. Also absent from the record is evidence of when Chaleff first determined, as the brothers' attorney, that the sessions could be helpful to the defense. As we have noted, Chaleff testified as follows:

Q: *And at some point in time*, either December 8th or some other day, do you have a recollection of deciding as their lawyer that therapy with Dr. Oziel should continue for the purpose of, perhaps, use of the material he was developing in the event that a case ever got filed against him?

A: *At some point* I decided that continuing therapy with Dr. Oziel would be beneficial, could be beneficial, *if he ever got arrested.*

(emphasis added).

[2] In sum, the facts and circumstances of this case bear no resemblance whatsoever to the situation confronted by the Supreme Court in *Ake* in connection with the Court's holding regarding an indigent's fundamental right to defend against charges brought by the state. The record conclusively dis-

proves Petitioners' assertion that Dr. Oziel was "an *Ake* psychotherapist." The California Court of Appeal upheld the trial court's finding that the December 11 session was for the purpose of therapy. Petitioners have fallen far short of rebutting this finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) ("In a [habeas] proceeding . . . a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Because the purpose of the December 11 session was therapeutic, rather than to establish a defense, *Ake* is inapplicable. Thus, we reject Petitioners' claim that their trial and resulting convictions were infected with *Ake* error.

## C.   Imperfect Self-Defense Instruction

**[3]** California recognizes imperfect self-defense in homicide cases where the killing resulted from an "actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury." CALJIC No. 5.17 (1995); *see In re Christian S.*, 7 Cal. 4th 768, 771 (1994) (discussing imperfect self-defense). If imperfect self-defense is established, the defendant can be guilty of no more than manslaughter because the requisite malice necessary for murder is absent. *Id.* Though a reasonable person need not view the peril as imminent, the defendant must make some showing that he actually believed the peril to be imminent. *Id.* The fear, no matter how great, cannot be of prospective danger or even one that is in the near future. *Id.* at 783. Rather, "*[a]n imminent peril is one that, from appearances, must be instantly dealt with.*" *Id.* (internal quotation marks and citation omitted).

Under California law, a defendant is entitled to a jury instruction only if substantial evidence, or "evidence sufficient to deserve consideration by the jury," supports the giving of that instruction. *People v. Barton*, 12 Cal. 4th 186, 201 & n.8 (1995) (internal quotation marks omitted). The state

trial court conducted an extensive hearing to determine whether the imperfect self-defense instruction was warranted, and concluded that, taking Erik's version of the circumstances as true, there was not substantial evidence of a belief that the danger was imminent. Accordingly, the court declined to give the imperfect self-defense instruction.

The California Court of Appeal affirmed, concluding that there was no error in the trial court's decision not to give the instruction because the defense presented insufficient evidence under California law of a belief in imminent peril. Because Erik and Lyle left the house after the confrontation, went to the car, retrieved their shotguns, reloaded their guns with better ammunition, reentered the house, burst through the doors and began shooting their unarmed parents, the court concluded that there was no substantial evidence of a belief in imminent peril. The court placed special emphasis on Erik's testimony that Erik knew the danger to be in the future. Furthermore, the California Court of Appeal concluded that even if the trial court erred in failing to give the instruction, the omission was harmless because the jury necessarily resolved the question posed by the proposed instruction adversely to Petitioners.

The court's determination that this instruction was not appropriate and the state appellate court's affirmance of that decision resulted from interpretation of state law. Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief. *Estelle*, 502 U.S. at 67-68. The state court carefully applied state law principles and factually similar state cases and determined that no instruction was available to Petitioners because they failed to provide a basis upon which the instruction could be given. Quite simply, that should be the final word on the subject. However, because Petitioners argue

that the refusal to instruct violated federal due process, we press forward.[6]

**[4]** "Failure to give [a jury] instruction which might be proper as a matter of state law," by itself, does not merit federal habeas relief. *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985). The Supreme Court has stated instead that a claim that a court violated a petitioner's due process rights by omitting an instruction requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). In addition, a state trial court's finding that the evidence does not support a claim of imperfect self-defense is entitled to a presumption of correctness on federal habeas review. *Hartman v. Summers*, 120 F.3d 157, 161 (9th Cir. 1997). Because we agree with the state court's finding that Petitioners failed to demonstrate that they believed they were in *imminent* peril, we conclude that there was no error and thus that Petitioners' due process rights were not violated.

Petitioners contend that the state court failed to consider various categories of evidence that they assert supported their requested imperfect self-defense instruction. Specifically, Petitioners argue that the court ignored evidence that they were threatened with harm if they ever disclosed the abuse, as well as evidence of the confrontations leading up to the murders and Erik's testimony that he feared his parents might kill him. This argument fails because none of the evidence, including evidence of the abuse Petitioners allegedly suffered at the hands of their parents, or even the details concerning the confrontation that occurred the night of the attack before

---

[6]The State argues that this claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). We reject this argument and proceed to the merits of the claim, as it is a long-standing principle that instructional error may so infect a trial that the resulting conviction violates due process. *Estelle*, 502 U.S. at 72.

the victims and Petitioners retired to different locations, supported the imperfect self-defense instruction.

Indeed, the defense did present evidence that Jose had repeatedly abused his sons and that Kitty had acquiesced, for most of their lives. Erik testified that Jose had threatened to kill him if he revealed the sexual abuse. According to Erik, there had been several confrontations between Jose, Lyle, and Erik days before the murders. Erik testified at extraordinary length and in incredible detail about his childhood and his relationships with his parents, beginning with his allegations that his father began sexually molesting him at the age of six and following through incident by incident until he was eighteen. Erik testified that in the days leading up to the murders, he had some fear that, at some point, his parents would kill him — a fear that fluctuated in intensity during those final days.

Petitioners' focus on this evidence, however, is misplaced. Taken at face value, this background evidence served only to explain *why* the brothers might have had an unreasonable fear of their parents at the moment they killed them. At most, the evidence illustrated that Erik and Lyle[7] feared that their parents had the capacity to and might, at some point, harm them. Erik's testimony about his general fear in the days leading up to the murder does not provide any evidence that, at the moment he shotgunned his parents to death, he feared he was in imminent peril.

Even Erik's assertion that he feared his parents would kill him when they exited the room is insufficient to support the instruction. He testified that he "just wanted to get to the den as quickly as possible before my father got out of the den. If my dad got out of the den before I got there, it was over." But Erik admitted that the danger was in the future. He knew that

---

[7]In fact, evidence that Lyle ever feared his parents is so weak in the record that his claim could be rejected without discussion.

his parents could not kill him through the walls. He knew that "they would not kill me until they exited the den." Taking Erik's testimony as true, these killings were, in effect, pre-emptive strikes.

Thus, the instruction was not warranted under California law.[8] Had either Erik or Lyle presented evidence that, at the moment of the killings, they had an actual fear in the need to defend against *imminent* peril to life or great bodily injury, this evidence would have helped explain why they had that unreasonable fear. Nonetheless, the fears leading up to the murders and the reasons why such fears might have existed simply are not the threshold issue for California's imperfect self-defense instruction. *In re Christian S.*, 7 Cal. 4th at 783. Consequently, the state court's decision was not error, let alone a violation of due process.

## D.   Exclusion of Testimony and the Right to Due Process

Lyle and Erik sought to introduce testimony that could explain why they feared their parents. These witnesses were referred to by the trial court as so-called "source witnesses," people who had "observed certain things, either observed the interaction of the defendants with their parents or gave character evidence . . . relating to the parents, . . . things of that nature . . . ."

---

[8]Our decision in *DePetris v. Kuykendall*, 239 F.3d 1057 (9th Cir. 2001), in which we held that evidence of Battered Women's Syndrome was erroneously excluded, does not affect our conclusion. The state court in that case had already concluded that the evidence was erroneously excluded. Bound by that determination, we concluded, among other things, that the error was not harmless because the defendant had been restricted from testifying fully about her state of mind. *Id.* at 1063. Here, on the contrary, Erik's testimony was virtually unlimited, but he nevertheless failed to make the requisite showing of fear of imminent peril. In any event, *DePetris* is inapplicable here, as only Supreme Court decisions can form the basis of federal habeas relief. 28 U.S.C. § 2254(d)(1).

The trial court ruled, however, that the defendants were required first to lay a foundation, which in this case, could only be accomplished if the defendants testified about their actual belief of imminent danger. Indeed, we, too, see no other competent way in which the foundation could have been laid. Erik took the stand, but Lyle chose not to testify. Petitioners argue that the trial court's ruling violated their rights to due process because it forced them to choose between their Fifth Amendment right against self-incrimination and their Sixth Amendment right to present a defense. We disagree.

In disallowing this evidence, the trial judge explained:

The relevance of the expert testimony of these experts that we've referred to in the hearing, the relevance of that testimony was to and is to corroborate the testimony of the defendants regarding their mental state at the time of the killing, and to dispel certain misconceptions regarding the conduct of an individual faced with a situation or circumstances as described by the defendants.

The issue, as I looked at it and look at it now, is the state of mind of the defendants at the time of the killing as to whether there was an actual belief of imminent danger of death or great bodily injury and a need to act. Obviously, if that actual belief is not presented to the jury, then the experts have nothing to corroborate. . . .

Since the relevance of the expert testimony is related to the state of mind of the defendants at the time of the killing, the purpose of the experts' testimony that they had — that the defendants fit a certain diagnosis; that they are, whatever the expert says, a battered person — they fit the — or fit the diagnosis of a post-traumatic stress disorder, that is

only to corroborate the defendants' testimony as to their mental state at the time of the crime.

. . . .

It's really irrelevant, and it would be totally irrelevant to any trial, that the defendants had been abused or that they fit a particular diagnosis of being abused. *That's totally irrelevant, unless it corroborates their testimony as to their mental state at the time of the crime. If it doesn't do that, then the fact that they happen to be abused or happen to fit a particular diagnosis is irrelevant.*

. . . .

And as I look at it, the foundation of the testimony — of the evidence is the defendants' own testimony of that belief [of imminent danger] . . . .

(emphasis added). The California Court of Appeal agreed with the trial court's ruling, concluding that the issue was not whether Petitioners were required to testify, but whether the testimony of the relevant witnesses was admissible despite a lack of foundation.

Petitioners argue that the state court's decision is at odds with *Brooks v. Tennessee*, 406 U.S. 605 (1972). We disagree. In *Brooks*, the Supreme Court invalidated a Tennessee statute that required a criminal defendant who wanted to testify to do so before any other defense witnesses could be presented. *Id.* at 606. This case is not at odds with *Brooks*.

Apart from its limited holding, *Brooks* did not "curtail[ ] in any way the ordinary power of a trial judge to set the order of proof." *Id.* at 613; *see United States v. Singh*, 811 F.2d 758, 762-63 (2d Cir. 1987) (trial court may refuse to accept proffered testimony of witnesses until a proper foundation is laid).

The critical distinction between *Brooks* and the present case is that here, both Petitioners had the opportunity, at every stage of the trial, to decide whether or not to take the stand. On the contrary, the statute at issue in *Brooks* required the defendant to testify before any other witness was presented, lest he waive his right to testify in his own behalf. 406 U.S. at 610-11.

The state court correctly determined that Petitioners' right to decide whether to testify was not the relevant issue. Indeed, Petitioners expressly concede in their opening brief that "where [the] foundation can only come from the defendant, such a ruling [that the defendant first lay a foundation] would not violate *Brooks*." That is precisely the case here. Only the defendants could testify to whether they believed the peril was imminent. Petitioners' argument is in essence that the trial judge should have kept to himself his views about how the defense could lay a proper foundation.

[5] As a matter of state evidence law, a foundation had to be laid before the evidence could be admitted. In Lyle's case, the requisite foundation was not laid. Because Lyle failed to lay a foundation, the testimony of his cousin, Diane Vandermolen, was limited. If allowed, she would have testified that when Lyle was eight years old, he told her his father was molesting him and when Vandermolen told Kitty about this, she dragged Lyle upstairs. In addition, Lyle wanted to introduce an essay he wrote when he was fourteen entitled "I Will Change Your Verdict," a story about a man who was put on death row after killing the person who molested his twelve-year-old son. Finally, Lyle sought to introduce testimony of Dr. John Conte, who would have testified that Lyle suffered from Battered Person's Syndrome.

[6] Erik, on the other hand, presented some evidence of his state of mind to justify admission of additional evidence, and

consequently the evidence he proffered relevant to that foundation was admitted.[9]

**[7]** The state court's conclusion that Petitioners' due process rights were not violated was a reasonable interpretation of *Brooks*. With the benefit of having presided over the case twice, the trial judge knew precisely what evidence the defense had available to lay the requisite foundation. The judge did not require the defendants to take the stand; he merely regulated the admission of evidence, and his commentary as to what evidence might constitute a foundation did not infringe on Petitioners' right to decide whether to testify. The state court's decision was proper, and we thus reject this claim.

## E.   Exclusion of Testimony and the Sixth Amendment Right to Present a Defense

**[8]** Petitioners' claim here is closely related to the previous two claims we have rejected. The exclusion of certain evidence, they say, violated their rights to due process under the Fifth and Fourteenth Amendments and their Sixth Amendment right to present a defense because the proffered evidence would have served to explain why Petitioners felt they were in immediate danger on the night of the shootings. The trial court excluded as either cumulative or lacking foundation: (1) some evidence relating to specific instances of physical, psy-

---

[9]This does not conflict with our conclusion that Erik failed to present sufficient evidence of his state of mind to justify the giving of the requested imperfect self-defense instruction. In deciding what evidence to admit, the trial court had broad discretion and was required to make quick decisions as to the relevance of evidence in making its admissibility determinations. At the final stage of trial, on the other hand, when the trial court had an opportunity to view all the evidence before deciding what instructions were required by the evidence, the court properly concluded that the imperfect self-defense instruction was not warranted because Erik's testimony was insufficient to establish that he feared he was in imminent peril.

chological, and sexual abuse; and (2) some expert testimony that Petitioners suffered from Battered Person's Syndrome. The California Court of Appeal concluded that the trial court did not abuse its discretion in excluding this evidence because the court had admitted extensive evidence of the history of Petitioners' abuse at the hands of their parents. The very length of the defense case — more than two full months — belies an assertion that the court arbitrarily limited defense evidence.

[9] The Constitution guarantees a criminal defendant a meaningful opportunity to introduce relevant evidence on his behalf. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). But this right is subject to reasonable restrictions "to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. *See id.* The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate. *Id.*

Erik testified about the alleged abuse in great detail for roughly seven full court days. In addition, Brian Anderson, a cousin of Lyle and Erik, testified about severe physical abuse that Petitioners suffered at the hands of Jose. Diane Vandermolen testified about physical and verbal abuse by both Jose and Kitty. Andy Cano, also a cousin, testified that Erik confided to him that Jose was molesting Erik. Cano testified also that Erik always had bruises on his body. Several witnesses testified that when Jose was alone with one of his sons in the bedroom, no one was allowed to go near the bedroom. Dr. Vicary testified that Erik suffered from an anxiety disorder that could affect his mental state. In addition, Dr. Wilson testified that Erik suffered from Battered Person's Syndrome, depression, and post-traumatic stress disorder. Given all of

this testimony directly suggesting various forms of abuse as to both Erik and Lyle, the trial court excluded some of the other proffered testimony as cumulative. This decision survives scrutiny under *Crane*.

**[10]** We need not analyze this claim in any great depth, for even were we to conclude that the state court erred in its determination that the evidence was cumulative, such error would be harmless. As with the other excluded evidence we have discussed above, the proffered evidence would have served only to explain *why* Lyle and Erik might have actually feared their parents. But without any basis for support, and with the imperfect self-defense instruction unavailable, this evidence ultimately was irrelevant. Indeed, without the availability of imperfect self-defense, the proffered evidence would likely have served only to confuse and mislead the jury.

## F.   Closing Argument

Lyle claims that the prosecutor successfully moved to exclude a great deal of evidence regarding the allegations of abuse and mental health expert evidence, and then violated Lyle's due process rights by commenting, over objection, on the failure to present such evidence. He argues that this violated the due process principle that a defendant must be allowed to introduce evidence to rebut the charges against him. This claim fails.

**[11]** In determining whether a due process violation has occurred as a result of comments made by the prosecutor in argument, courts ask "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory. *Cf.*

*United States v. Garcia-Guizar*, 160 F.3d 511, 521-22 (9th Cir. 1998) (prosecutor did not shift the burden of proof in commenting on the defendant's failure to produce evidence). And a prosecutor may comment on the absence of evidence even when such evidence was available, but inadmissible, so long as there is sufficient evidence to support the prosecutor's version of events. *See Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (finding no misconduct where the prosecutor argued that the defendant had one intention when an inadmissible polygraph test suggested that he had a different intention). We conclude, as have the other courts to have considered this claim before us, that the prosecutor's comments were well within the bounds of professional conduct and did not render the trial unfair.

[12] Lyle points to three categories of comments made during the prosecutor's three-and-a-half-day closing argument. First, Lyle contends that the prosecutor improperly argued that Jose was a "patient man," and "one who would not be abusing his sons." Lyle argues that the defense was prevented from presenting evidence to the contrary — that in fact, Jose was an abusive father, one who had mistreated his sons for their entire lives. The defense was, as discussed above, allowed to present substantial evidence relating to the allegations of abuse. Indeed, Erik testified for seven days about the various types of physical, mental, and sexual abuse he claimed that his father inflicted. But when asked on cross-examination, Erik admitted that, despite years of alleged physical abuse, there were no witnesses who could testify that they had ever seen Jose hit his sons. Erik was unable to name a single person who had ever even asked Erik about the bruises and welts he claimed his father inflicted on him for years. As a result, the prosecutor merely presented his view of the evidence relating to what kind of man and father Jose was:

> I asked Erik Menendez: "Bearing in mind you were so frightened of your father, he was always

going to punish you for everything, what was the punishment for the burglaries?"

And he said: "No punishment." No punishment for the burglaries.

Ladies and gentlemen, Jose Menendez was not a punitive man. Jose Menendez was a man who forgave his sons time and time again, even for the most serious of transgressions. He was a very patient man, and as much as he was disappointed in his sons, he forgave them.

. . . .

Then the other reason why they were able to do what they did was because Jose Menendez had taught them something, taught them a very valuable lesson. But that lesson was turned against Jose Menendez. He taught them to be strong. He taught them to be ruthless.

Jose Menendez had to be ruthless in order to achieve what he achieved. . . . He was in fact a very ruthless man. But Jose Menendez never turned that ruthlessness toward his own family.

But the defendants in this case, who were taught to be ruthless, and who didn't have a father there all the time, or a mother to meet all of their needs, decided to turn their rage and use that ruthlessness that they learned from their father toward their own parents.

. . . Lyle Menendez admits — and I even questioned Erik Menendez about this while he was on the stand, and Erik Menendez doesn't deny the truthfulness of this assertion — that Jose Menendez cried

when he heard about the Calabasas [burglary] incident, and Jose Menendez cried when he heard about his son's failure in Princeton.

This tells you a great deal, ladies and gentlemen, about the compassion and the love that Jose Menendez had for his sons. Is this the kind of man who would be abusing his sons?

He said — Lyle Menendez says: "After the Calabasas issue, he cried, and we were together. We were close. This was the first time he cried in front of me."

And he later goes on to say: "He cried after the Calabasas issue, after I said that, you know, Erik and I were very sorry, and the whole deal — and I'm sorry for all the trouble that you were caused through this whole issue," and he cried, and he felt — I think he cried a lot after the Princeton issue, and I came to him and I said this and that."

Again, they want you to see Jose Menendez as a cold monster. Easy to make those claims, ladies and gentlemen. It's very easy, especially when you say, "Well, Mr. Conn, this happened behind closed doors, you see. That's the reason why I don't have any witnesses, Mr. Conn. It, all happened behind closed doors."

But ladies and gentlemen, Jose Menendez was a man who wanted the best for his sons. Time was precious to him, yet he took time out of his own schedule to attend all of the sporting events of his sons, and he was a man who cried for his sons.

In context, we think it is clear that the prosecutor simply argued to the jury that, based on evidence the jury heard, Jose

was not abusive, contrary to what some of the witnesses had testified. With this category of comments, we find no error.

**[13]** Second, Lyle argues that the prosecutor committed misconduct by arguing that "Lyle Menendez did not call a mental health expert." Indeed, Lyle Menendez did not call a mental health expert because he failed to present any admissible evidence in this regard. Moreover, viewed in the context of the prosecutor's argument, the comment was not about Lyle's failure to call a mental health expert, but a question about whether Lyle had any explanation for his conduct at all:

> They want us to believe that there is some kind of automatic pilot that took over.
>
> . . . .
>
> Ladies and gentlemen, you base the facts of this case upon what Erik Menendez told you. You know Erik Menendez now. You saw him testify. You saw his explanation, and you know he was able to think. He was able to make connections. His story was inconsistent. He concedes time and time again he has this rational process — he doesn't want to use those words.
>
> So this was no automatic pilot, ladies and gentlemen. What are we supposed to believe, that two men were [on] automatic pilot? Isn't that kind of like lightening striking twice at one time at the same place?
>
> Two men on automatic pilot. Is that what we're supposed to believe? Do they both have the same defense here? Lyle Menendez did not call a mental health expert. Is that what he's claiming?
>
> Even the thought that these two men would both have this absurd belief in their mind that their par-

ents were going to kill them, there was no way out, that they had to kill their parents.

> That, too, would be like lightening striking twice in the same place, at the same time.

Here again, viewing the statement in context, we agree with the state courts and the district court — the prosecutor merely commented on the state of the evidence. Lyle did not call a mental health expert because he failed to lay a foundation in this regard. He offered no admissible evidence that would explain his actions, and the prosecution simply called attention to that fact. We find no error.

**[14]** Finally, Lyle contends that the prosecutor argued that there was no evidence of sexual abuse. This was error, he argues, because Petitioners were prevented from presenting the ample evidence they offered suggesting that sexual abuse had taken place. Again, we find it necessary to view these comments in context:

> Don't decide this case based upon sympathy. Erik Menendez and Lyle Menendez should be held responsible for their action, and this is the one and only opportunity the jury is going to have to be able to do that.

> And then there [were] references to greater appreciation for his supporters. "Only now do I realize how much people love me," or something like that.

> Again, trying to portray Erik Menendez in a favorable light. And once again, I ask you not to decide this case based upon such factors.

> A great deal of evidence was presented concerning the allegations of sexual abuse, and as I indi-

cated, there is no evidence whatsoever that the sexual abuse ever took place.

A great deal of efforts were made to try to get you to believe that there was a fear of physical abuse of Erik Menendez. And once again, that wasn't demonstrated. I will go through the rest of the defense witnesses, and you will see how that really wasn't demonstrated through those witnesses either.

One of the pieces of evidence that was presented in this case were the so-called nude photographs. You recall those, the photographs.

[The court called a recess.]

[Continuing argument after the recess:]

There is no corroboration of sexual abuse. One of the allegations in this case is that Jose Menendez would take photographs of his sons in the nude.

Ladies and gentlemen, that is a very easy allegation to make, when two such photographs do exist. But the question is just because those photographs exist, does that mean that that's proof that Jose Menendez was the one who took those photographs?

As discussed above, the defense presented ample evidence suggesting Erik and Lyle had been abused by their father. The prosecutor merely offered his argument as to how the jury should interpret that evidence.

Lyle points to authority he contends holds that where evidence is offered, but excluded by the prosecutor, due process is violated if the prosecutor comments on the failure of the defense to present such evidence. In addition to a series of state and district court cases, the defense cites *Paxton v.*

*Ward*, 199 F.3d 1197 (10th Cir. 1999); *United States v. Ebens*, 800 F.2d 1422 (6th Cir. 1986), *abrogated on other grounds*, *Huddleston v. United States*, 485 U.S. 681 (1988); *United States v. Toney*, 599 F.2d 787 (6th Cir. 1979). Regardless of the merits of these cases, here the jury *heard* massive amounts of defense evidence, again, more than two full months, about the kind of parents Petitioners claimed Jose and Kitty were. There was no doubt here that the jury had been presented with evidence that Jose was an abusive father — we cannot hold that the prosecutor was not allowed to present the jury with his interpretation of that evidence.

**[15]** The prosecutor may argue reasonable inferences from the evidence presented, which is precisely what he did here. *United States v. Young*, 470 U.S. 1, 8 & n.5 (1985). These were "hard blows," not "foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935) ("[W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones."). Thus, because we find no error in the prosecutor's argument, the state court's decision does not contravene, or involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, we reject this claim.

## CONCLUSION

For the reasons explained, Petitioners are not entitled to federal habeas relief. The judgment of the district court is accordingly **AFFIRMED**.