[No. 16133-4-I.   Division One.   August 25, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. TIMOTHY
PABLO GARCIA, *Appellant.*

*Timothy Pablo Garcia,* pro se, and *Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Deborah J. Phillips, Senior Appellate Attorney,* for respondent.

PEKELIS, J.—Timothy Pablo Garcia appeals his conviction for the second degree murder of Michael Encinas. He alleges that the prosecution's suppression of exculpatory evidence and the trial court's failure to compel discovery of that evidence violated due process. In a pro se supplemental brief, he alleges that he was ineffectively represented by counsel. We affirm the conviction.

Early on the morning of June 2, 1984, Garcia and some friends were having a party at the home of Garcia's girl friend, Gloria. Everyone drank heavily, smoked marijuana, and partied until about 4:30 a.m. By that time, everyone but Garcia, Encinas, and Gloria's daughter, Lisa, had passed out.

Lisa claimed that she was the only eyewitness to the ensuing incident and gave a statement to police on June 2

consistent with her testimony at the trial which commenced on December 5, 1984. She testified that Garcia and Encinas began to wrestle when Garcia hit his head, cutting it. Lisa got a towel for him, and Garcia went into the bathroom. Shortly thereafter, Garcia returned and jumped Encinas from behind. Encinas fell on the floor. Garcia said, "'This is it. This is where it ends right here. I'm tired of it,'" and then he began making punching motions. Lisa didn't realize that he had a knife in his hand until she saw the blood. She ran into the bedroom to call the police, dialed 911, and began to give her address when Garcia yanked the telephone cord out of the wall, and said, "'No police. No police.'" He said that he would take care of everything.

The other persons at the party, some of whom testified at trial, confirmed that they were awakened by Lisa, saw the body and Garcia with a knife in his hand. Don, Lisa's cousin, testified that he asked Garcia what happened to which Garcia replied, "'I stabbed him. He is dead.'" Don also saw Lisa attempt to call the police, but Garcia pulled the telephone from the wall.

Everyone left the house and one couple went across the street to the Encinas home to tell the family that Michael Encinas was dead. One of the victim's brothers then went over to Gloria's house, knocked on the door, and when Garcia opened it, shot him in the arm with a rifle. The decedent's brothers later found and assaulted Tony Coleman, Lisa's boyfriend, and Gloria, Lisa's mother. Continued threats from the Encinas compelled Lisa and her mother to change their residence with the assistance of the Seattle Police Department victim's assistance unit.

When Garcia was arrested for the murder of Encinas and read his *Miranda* rights, he said, "'Dead. Dead. He's dead. Oh, shit, bad trip.'" Then he said, "'Hung, hung. I am hung, blame me for it.'" At that point, the investigating detective asked Garcia if he had killed Encinas to which Garcia replied, "'I don't know, I am not saying that I did it, but I am not saying I didn't.'" Garcia said that he was afraid he would be blamed for the murder because he was an out-

sider. The detective later went to Gloria's house and observed that the telephone cord had been ripped from the wall.

At trial, Garcia testified that he was passed out when Encinas was killed and did not know who perpetrated the crime. However, he suspected Tony because he had heard Tony and Encinas arguing earlier that evening. For reasons unrelated to Encinas' death, Tony had been arrested and jailed shortly after the homicide. His cell mate testified that Tony had told him he was in jail on a traffic warrant and possibly a murder charge. Tony also told his cell mate that he had been in a house where two people had been involved in a fight which resulted in someone's death, and to keep from being implicated, he called the police. The cell mate testified that he had the distinct impression that more than one person had been involved in the stabbing.

On September 14, 1984, Lisa informed the deputy prosecutor handling the case[1] that she had really not seen the stabbing as she had previously claimed. She said that she had accused Garcia because she was afraid that Encinas' family might hurt her or her family. The deputy prosecutor did not inform defense counsel of Lisa's recantation or provide counsel with a copy of her notes of the conversation. On September 27, however, Lisa called defense counsel herself, told her of the September 14 conversation with the prosecutor, and made a written statement summarizing that conversation.

Garcia moved to either dismiss the case because the deputy prosecutor had failed to disclose the statement or, in the alternative, to compel the deputy prosecutor to turn over her notes after the court had reviewed them in camera. At the hearing on the motion, Lisa testified that her original statement to police was true and her September 14 and September 27 statements were false. She also testified that she had told defense counsel everything she had told the deputy prosecutor. The motion was denied on the ground

---

[1]We note that the trial deputy did not represent the State on appeal.

that Lisa's statement was not exculpatory since it was "a pack of lies." The court also refused to conduct an in camera hearing. Garcia renewed his motion for discovery of the deputy prosecutor's notes at trial, but the motion was again denied, this time on the ground that the notes were work product and therefore not discoverable.

Garcia contends that he was denied a fair trial because the prosecution failed to disclose material exculpatory evidence in violation of his constitutional due process rights, pursuant to *Brady v. Maryland,* 373 U.S. 83, 85, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) and CrR 4.7. He also contends that the trial court erred when it denied his motion to compel discovery of that evidence or for an in camera review of the prosecutor's notes to determine whether they contained any exculpatory information.

■ CrR 4.7(a) addresses the prosecutor's obligation to provide discovery. The rule specifically requires that the prosecutor disclose to the defendant, no later than the omnibus hearing

> (i) the names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with any written or recorded statements *and the substance of any oral statements of such witnesses*;

(Italics ours.) CrR 4.7(a)(1)(i). CrR 4.7(h)(2) makes clear that the prosecutor's obligation is ongoing:

> *Continuing Duty To Disclose.* If, after compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall *promptly* notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.

(Italics ours.) This court has stated that "promptly," as used in CrR 4.7(h)(2) means "at the moment of discovery or confirmation". *State v. Oughton,* 26 Wn. App. 74, 79, 612 P.2d 812 (1980).

In addition, CrR 4.7(a)(3) specifically requires the prosecutor to disclose

any material or information within his knowledge which tends to negate defendant's guilt as to the offense charged.

Implicit in the hearing judge's determination that Lisa's September 17 statement was "a pack of lies" and therefore not exculpatory is the assumption that the duty to disclose can be abrogated simply because a deputy prosecutor believes the recantation is false. Such reasoning finds no support in the law. The principles behind the broad criminal rules adopted in this state and the express language of CrR 4.7(a)(1)(i) and 4.7(h)(2) required the deputy prosecutor to immediately disclose to defense counsel the substance of the September 14 oral statement made by the only eyewitness to the crime. There is no exception to this obligation to disclose which would allow either the prosecutor or the court to determine whether the statement is false and, if so, to permit nondisclosure. A rule of disclosure which depended on the, perforce, subjective analysis of a deputy prosecutor made during preparation of a case would be meaningless. It is far too tempting to merely dismiss the unfavorable version as false.

Moreover, the court erred in focusing solely on whether the oral communication was exculpatory. While this is an essential consideration under CrR 4.7(a)(3), the disclosure of the substance of the oral communication was also clearly compelled under CrR 4.7(a)(1)(i). There is no distinction between inculpatory and exculpatory evidence under this rule, and this court has expressly declined to forge such a distinction. *Oughton,* at 79.

██ The trial court also denied the defendant's motion to compel discovery renewed at trial. The court reasoned that the notes constituted work product, and thus were not discoverable. The court also declined to conduct an in camera review. While CrR 4.7(f) does recognize some limitations to the prosecutor's obligation to provide discovery, the applicable portion of the rule is as follows:

(1) *Work Product.* Disclosure shall not be required of legal research or of records, correspondence, reports or

memoranda *to the extent that they contain the opinions, theories or conclusions of investigating or prosecuting agencies . . .*

(Italics ours.) However, the deputy prosecutor did not contend that her notes contain "opinions, theories" or her "conclusions." Rather, in her argument to the trial court, she resisted disclosure because her notes were incomplete, containing only what she thought was important in Lisa's oral statement to her. Thus, the State has not demonstrated that the notes in question contain any "work product" as defined by the rule.

The State argues that a lawyer's notes are per se "work product." Neither federal nor state law supports this contention. Interpreting the Jencks Act, the United States Supreme Court has rejected the argument that the principles underlying the "work product" doctrine exclude a lawyer's writing if it otherwise fits the statutory definition of a producible statement. *Goldberg v. United States,* 425 U.S. 94, 102, 47 L. Ed. 2d 603, 96 S. Ct. 1338 (1976). Our courts, in interpreting CrR 4.7, have also refused to insulate materials from discovery simply because a statement was taken or notes compiled by an attorney. *State v. DeWilde,* 12 Wn. App. 255, 257, 529 P.2d 878 (1974).

Thus, absent a representation by the State that the notes contain the type of material specifically protected by the work product rule, the State's reliance on the exception embodied in CrR 4.7(f) is not well taken. Our Supreme Court has not yet answered the question of whether rough notes are discoverable as of right, *State v. Dictado,* 102 Wn.2d 277, 298, 687 P.2d 172 (1984), but we need not reach that issue here. Defense counsel moved twice for either the production of the notes or for an in camera review of the notes to determine whether they contained any additional statements by the witness other than those subsequently reported to defense counsel. Similarly, on appeal, Garcia's counsel urges this court only to remand the matter to the trial court "to review the prosecutor's notes and to order all portions of the notes that purport to record or summarize

Lisa's statement to be disclosed to the defendant."

We hold that it was error to fail to hold an in camera review under the circumstances here. First, the deputy prosecutor had already demonstrated her lack of appreciation for her obligation to provide discovery under CrR 4.7.[2] Second, no showing was made that the notes actually contained work product. Thus, the in camera procedure should have been utilized to review the notes, determine if any material statement not reported to defense counsel was contained therein, and if so, excise any portion which was work product and provide the rest to defense counsel. Such a procedure was expressly approved by the United States Supreme Court in *Goldberg,* at 108–09, and tacitly by the court in *State v. Dictado, supra* at 298, when it accepted this court's previous order to the trial court to review rough notes in camera to compare them with the materials previously provided to the defense.

We find, however, that it is more expedient and equally appropriate for this court to conduct the necessary review. We have been provided with the notes in question and our in camera inspection reveals that they contain only sketchy references to the facts as reported to defense counsel on September 27.

Thus, although the deputy prosecuting attorney failed to comply with CrR 4.7(a)(1)(i), (a)(3), and (h), and the court below erred in refusing to conduct an in camera review of her notes, the errors do not warrant reversal. The suppressed exculpatory evidence must be constitutionally "material" either to guilt or punishment pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Recently, in *United States v. Bagley,* 473 U.S. 667, 676, 87 L. Ed. 2d 481, 105 S. Ct. 3375, 3380 (1985), the Court made clear that both impeachment evidence and

---

[2]At oral argument, the State conceded that the deputy prosecutor should have called in a police officer to take Lisa's statement on September 14 and then provided it to counsel. We note that this is but one of several means the State might employ to prevent this problem from occurring in the future.

exculpatory evidence fall within the *Brady* rule and should be disclosed, but concluded:

[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

*Bagley,* at 678.

Here the issue of materiality is resolved by the fact that our review of the notes demonstrates that their suppression did not ultimately undermine the process. Rather, the notes seem only to confirm that on September 24 the defense obtained the substantial equivalent of the exculpatory September 17 statement. Defense counsel was able to utilize the evidence for impeachment purposes by attacking Lisa's credibility in effective cross examination regarding her inconsistent statements. *See United States v. George,* 778 F.2d 556, 561 (10th Cir. 1985).

In a pro se supplemental brief, Garcia contends that he was denied effective counsel at trial. However, he has not sufficiently complied with the procedural rules to enable us to completely or adequately address the issue. For example, Garcia fails to cite to the record in violation of RAP 10.3(a)(5), fails to provide this court with the relevant record in violation of RAP 9.2(b), and fails to include photographs to which he claims his counsel should have objected. A party seeking review has the burden of perfecting the record so that the appellate court has before it all the evidence relevant to the issue. *State v. Jackson,* 36 Wn. App. 510, 516, 676 P.2d 517, *aff'd,* 102 Wn.2d 689, 689 P.2d 76 (1984).

In order to show ineffective assistance of counsel the defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. The defendant must also show that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, 2064 (1984), adopted in *State v. Jeffries,* 105 Wn.2d 398, 418, 717 P.2d 722 (1986). Our review of the

record which is before us demonstrates that counsel here zealously, but unsuccessfully, moved to suppress Garcia's statement upon arrest because of the alleged *Miranda* violations. The constitution does not guarantee successful assistance of counsel. *State v. Tuttle,* 26 Wn. App. 382, 385, 612 P.2d 823 (1980). In addition, counsel showed skill in questioning, cross–examining, making objections and making opening and closing statements. *See Tuttle,* at 385; *State v. Wilson,* 29 Wn. App. 895, 904 (1981). The other actions complained of merely reflect the selection of trial tactics which the courts have held do not constitute ineffective assistance of counsel. *State v. Renfro,* 96 Wn.2d 902, 909, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982).

We find that counsel made no error so serious that she was not functioning as "counsel." Therefore, her actions could not have prejudiced Garcia, and his claim is without merit.

Affirmed.

RINGOLD, A.C.J., and GROSSE, J., concur.