# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72210-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| VINCENT PAUL MELENDREZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 28, 2015 |
| | ) | |

LEACH, J. — Vincent Melendrez appeals his convictions for child rape, incest, and witness tampering. Primarily, he raises constitutional and foundational challenges to the trial court's evidentiary rulings. The trial court's decisions about evidence did not violate Melendrez's right to present a defense or his privilege against self-incrimination. Because Melendrez's numerous other arguments also lack merit, we affirm.

## FACTS

### Substantive Facts

After Vincent Melendrez and his wife divorced in 2007, he raised their seven children in western Washington. R.M. is his oldest child, followed by two boys, W.M. and D.M. The family changed residences every year or so. For two long periods, they lived in Bremerton with Melendrez's brother Charlie and

mother, Guadalupe. Melendrez began working nights at Microsoft in 2008. In November 2010, the family moved into the Windsor Apartments in Renton.

Melendrez was a strict father. He set three rules for his family: never lie to or betray him, love each other, and defend the family. He posted a schedule on the refrigerator that governed his children's days. If they wanted to have friends over, Melendrez insisted he meet the friends first. When his children misbehaved by talking back, sneaking out, or having friends over without permission, Melendrez punished them physically, sometimes hitting them with a belt.

R.M. testified her father began having sex with her in 2008, when she was 12 or 13 and the family lived at Charlie's house in Bremerton. She described the first incident, during which she said Melendrez showed her pornography, put his mouth on her vagina, and had vaginal intercourse with her. She testified that Melendrez had sex with her regularly between 2008 and 2011. She said that her brothers, W.M. and D.M., found her naked in bed with Melendrez in January 2009, then told her grandmother, Guadalupe, what they saw. R.M. said Guadalupe told her, "You need to push him away" and "Don't say anything because you don't want to get the family in trouble." W.M., D.M., and Guadalupe contradicted R.M.'s testimony, saying these events never happened.

R.M. testified that Melendrez became more controlling after he began having sex with her, rarely letting her leave the house. She said sex became more frequent after the family moved to Renton and that her father virtually moved her into his bedroom.

R.M. told D.M. in early 2009 that she and her father "did it." When D.M. confronted Melendrez about it, he denied it. Afterward, Melendrez forced R.M. to retract her claim in front of the family. After this incident, R.M. told W.M. two more times that her father was raping her. She also told a friend. On Thanksgiving 2010, R.M. left her house and stayed at the friend's house for three days. She refused to return home. During that time, she told the friend that her father had been having sex with her. Melendrez persuaded R.M. by phone to return home to collect her things. When she arrived, he pulled her inside and slammed the door. As punishment for running away, Melendrez removed R.M. from public high school and enrolled her in online classes. She remained in online school until the next school year began in September 2011, when he allowed her to return.

R.M. continued living at home. That August, Melendrez found pictures of naked people on her phone. He grounded her and threatened to prevent her from returning to high school. Then on October 3, 2011, the manager of the family's apartment complex found R.M. and a 16-year-old boy engaging in oral

sex in a common restroom. When the manager notified Melendrez, he appeared to take the news calmly. But R.M. testified that Melendrez then beat her, made her face bleed, shoved soap in her mouth, and called her a whore. She said Melendrez imprisoned her in his room for all of October 4, blocking the door with an ironing board, a mattress, and a shoe. R.M. testified that she had nothing to eat until her brothers arrived home from school and let her out. Her brothers again contradicted her testimony. They testified that R.M. was not barricaded in her father's bedroom that day but that she and D.M. had a fight in which D.M. hit R.M. in the face repeatedly, breaking her lip. D.M. said the fight began because R.M. told D.M. she was planning to lie about their father sexually abusing her.

The next day, October 5, R.M. spoke to a counselor at her high school. During that interview, she told the counselor that her father had been having sex with her since 2008. The police arrested Melendrez later that day. Susan Dippery, a sexual assault nurse examiner, examined R.M. the same day.

At trial, the State presented DNA (deoxyribonucleic acid) evidence taken from the underwear R.M. wore to school on October 5 and from the boxers Melendrez was wearing when arrested, along with DNA evidence gathered during the sexual assault examination of R.M. The DNA analysis showed Melendrez's sperm and semen on the exterior of R.M.'s genitals. It also found R.M.'s DNA on the fly of Melendrez's boxers.

-4-

Procedural Facts

The trial court let the State amend the information three times during trial. The second amendment came a month into trial when the State dismissed count II and enlarged the charging period of count I to include the period charged in count II.[1] Melendrez asked for a bill of particulars, which the court denied.

Nurse Dippery noted in her examination that part of R.M.'s hymen remained intact. The State asked her if she would be surprised, based on her experience, to observe with this remnant a 16-year-old girl who had had sex 100 times. Melendrez objected that the question exceeded the scope of Dippery's expertise. The court overruled the objection, and Dippery answered, "No."

Melendrez's defense focused on R.M.'s motive to lie. He tried to introduce evidence that R.M. constantly misbehaved by sneaking out of the house, "sexting," having boys over without permission, and engaging in sexual activity; that Melendrez disciplined her in response to her behavior; and that, in retaliation and to break free, R.M. fabricated a story of sex abuse. The State objected to the introduction of misbehavior evidence as irrelevant, prohibited by the rape shield statute, RCW 9A.44.020, and improper evidence of past specific acts under ER 404(b). The trial court ruled Melendrez could introduce this evidence if he first presented evidence that he knew of the misbehavior and disciplined R.M.

---

[1] Both counts were for rape of a child in the second degree.

in response to it. Ultimately, Melendrez introduced numerous instances of misbehavior. Melendrez testified after three other defense witnesses. His testimony was then interrupted several times by that of several other defense witnesses to accommodate their schedules.

Late in the trial and in the jury's presence, the judge asked, "Is the jail able to staff until 4:30 tomorrow afternoon?" Melendrez moved for a mistrial outside the jury's presence, arguing this comment informed the jury he was in custody. The court denied his motion.

The trial court instructed the jury that to convict Melendrez of count IV, incest committed between April 29, 2011, and October 4, 2011, the jury had to find "one particular act of Incest in the First Degree . . . proved beyond a reasonable doubt" and that it "must unanimously agree as to which act has been proved." During deliberations, the jury asked the court, "Do we need to point to a specific incident or just agree an act occurred during this time frame[?]" The court reasoned that it would be hard "to explain it any more plainly than it exists in the jury instruction" and that changing instructions in such situations "can sometimes create more problems than . . . solutions." Accordingly, it referred the jury back to the relevant parts of the instructions.

STANDARD OF REVIEW

We review questions of law de novo, including alleged violations of the Sixth Amendment right to present a complete defense and Fifth Amendment privilege against self-incrimination,[2] alleged violations of the right to an impartial jury and the presumption of innocence,[3] and the constitutional adequacy of jury instructions.[4] We use common sense to evaluate the effect of an act on the judgment of jurors.[5]

We review evidentiary rulings, denials of motions for bills of particulars, and denials of motions for a new trial for abuse of discretion.[6]

ANALYSIS

Right To Present a Complete Defense

The trial court ruled that evidence of R.M. sneaking out, "sexting," having boys over, and having sex was relevant and thus admissible only if Melendrez presented evidence he knew of that behavior. Melendrez contends that this ruling violated his Sixth Amendment right to present a complete defense.

---

[2] State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).
[3] State v. Gonzalez, 129 Wn. App. 895, 900, 120 P.3d 645 (2005).
[4] State v. Gonzalez-Lopez, 132 Wn. App. 622, 637, 132 P.3d 1128 (2006).
[5] Gonzalez, 129 Wn. App. at 900-01.
[6] State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014); State v. Dictado, 102 Wn.2d 277, 286, 687 P.2d 172 (1984), abrogated on other grounds by State v. Harris, 106 Wn.2d 784, 725 P.2d 975 (1986); State v. Robinson, 79 Wn. App. 386, 396, 902 P.2d 652 (1995).

The State responds first that we should decline to consider this issue because Melendrez raised it for the first time on appeal. A failure to object to a trial court error generally waives a party's right to raise the challenge on appeal unless a "manifest error affecting a constitutional right" occurred.[7] This court previews the merits of a claimed constitutional error to determine whether the argument is likely to succeed.[8]

Under the Sixth Amendment, defendants have a right to "'a meaningful opportunity to present a complete defense.'"[9] This does not give them a right to present irrelevant evidence, however.[10] The trial court has discretion to determine the relevance of evidence.[11]

In State v. Jones,[12] the Supreme Court ruled that a trial court's refusal to allow a defendant to testify to the circumstances of an alleged sexual assault violated the defendant's right to present a defense. The proffered testimony indicated that the sexual contact occurred consensually during an alcohol-fueled

---

[7] RAP 2.5(a); State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015).

[8] State v. Huyen Bich Nguyen, 165 Wn.2d 428, 433-34, 197 P.3d 673 (2008).

[9] Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (internal quotation marks omitted) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)); see State v. Lynch, 178 Wn.2d 487, 491, 309 P.3d 482 (2013).

[10] Jones, 168 Wn.2d at 720.

[11] Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010).

[12] 168 Wn.2d 713, 721, 230 P.3d 576 (2010).

sex party and was not rape as the complaining witness claimed.[13] The court distinguished "between evidence of the general promiscuity of a rape victim and evidence that, if excluded, would deprive defendants of the ability to testify to their versions of the incident."[14] The court reasoned that the proffered evidence was not "marginally relevant" but of "extremely high probative value," since it was the defendant's "entire defense."[15]

In contrast, the evidence Melendrez sought to introduce was not his "entire defense." Excluding evidence of R.M.'s perceived misbehavior did not deprive Melendrez of the ability to testify to his version of any incident, as in Jones.[16] Instead, testimony that R.M. was sexually active, used drugs, and broke her father's rules resembled general promiscuity evidence, which, as the trial court correctly ruled, could only be relevant to show bias. Even then, its probative value was slight. The evidence Melendrez sought to introduce was thus "marginally relevant," not "high[ly] probative."[17]

In addition, defendants seeking appellate review of a trial court's decision to exclude evidence generally must have made an offer of proof at trial.[18] An extended colloquy in the record can substitute for this offer of proof if it makes

---

[13] Jones, 168 Wn.2d at 721.
[14] Jones, 168 Wn.2d at 720-21.
[15] Jones, 168 Wn.2d at 721.
[16] See Jones, 168 Wn.2d at 720-21.
[17] See Jones, 168 Wn.2d at 721.
[18] State v. Vargas, 25 Wn. App. 809, 816-17, 610 P.2d 1 (1980).

clear the substance of the evidence a party wished to introduce.[19] If Melendrez wanted to preserve error as to the exclusion of an item of evidence, he should have made an offer of proof at trial. He concedes that he did not do so. And neither the record nor oral argument makes clear the substance of the evidence Melendrez wished to introduce. Melendrez thus did not preserve the right to request review of the exclusion of evidence about R.M.'s perceived misbehavior.

Further, Melendrez did introduce evidence of that behavior and the discipline he imposed in reaction to it. Before trial, Melendrez's counsel argued that the trial court should allow Melendrez to present evidence showing why he took disciplinary steps against R.M. This evidence included R.M.'s brothers' discovery of "sexts" on her phone and the ensuing conversations between R.M., her brothers, and Guadalupe. It also may have included evidence referred to in Melendrez's trial briefing, including suspected drug use, sexual activity, lying, and generally hanging out with the wrong crowd. Either the State or Melendrez eventually introduced evidence of all this behavior. Thus, not only did Melendrez fail to preserve this issue by making an offer of proof at trial, but he has not shown that the trial court excluded any highly probative evidence.

Melendrez claimed that he had reason to punish R.M. and this gave R.M. a motive to lie about Melendrez raping her. The facts introduced at trial to

---

[19] State v. Ray, 116 Wn.2d 531, 539, 806 P.2d 1220 (1991); ER 103(a)(2).

support this defense gave the jury ample opportunity not to believe R.M. That it believed her does not give Melendrez grounds for appeal.

Melendrez further contends that repeated interruptions "fragment[ed]" his testimony and violated his "right to a complete and meaningful defense." But Melendrez cites no case in which a court found constitutional error in an evidentiary ruling because it interrupted a defendant's testimony. Melendrez's counsel made no objection to the interruptions at trial. And an objection would have made no sense, as the schedules of Melendrez's own witnesses made the interruptions necessary.[20]

Because our preview of the merits shows that Melendrez likely will not succeed on his Sixth Amendment claim, Melendrez does not show a manifest constitutional error on appeal. We therefore decline to review his Sixth Amendment claim under RAP 2.5(a).

Privilege against Self-Incrimination

Melendrez also contends that the trial court's evidentiary rulings violated his privilege against self-incrimination by compelling him to testify in order to introduce evidence about R.M.'s behavior.

---

[20] For example, Melendrez's counsel stated at one point, "So I think we can fill the day tomorrow. . . . I can have one witness available at 9, I can have the Skype [live video chat and long-distance voice calling service] testimony after that, I can have another witness here at 1:30, and we could have Mr. Melendrez fill all the points in between."

A state law requiring a defendant to testify before any other defense witnesses violates that defendant's Fifth Amendment right against self-incrimination.[21] This rule is not "a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony."[22] An evidentiary ruling can thus affect the order of defense witnesses without violating the defendant's right to present a defense.[23] ER 611(a) gives the trial court wide discretion over the order and presentation of evidence.[24]

In Menendez v. Terhune,[25] the Ninth Circuit held that the trial court's ruling that certain evidence was inadmissible without the defendants testifying first did not violate the defendants' due process rights. The defendants sought to introduce evidence to explain their alleged fear of their parents to bolster the defendants' claim of self-defense in killing them.[26] The trial court ruled that the defendants' witnesses could not testify until after the defendants laid a foundation

---

[21] Brooks v. Tennessee, 406 U.S. 605, 607, 92 S. Ct. 1891, 32 L. Ed. 2d 358 (1972).

[22] Harris v. Barkley, 202 F.3d 169, 173 (2d Cir. 2000).

[23] See Menendez v. Terhune, 422 F.3d 1012, 1031 (9th Cir. 2005); Johnson v. Minor, 594 F.3d 608, 613 (8th Cir. 2010).

[24] Sanders v. State, 169 Wn.2d 827, 851, 240 P.3d 120 (2010). "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." ER 611(a).

[25] 422 F.3d 1012, 1032 (9th Cir. 2005).

[26] Menendez, 422 F.3d at 1030.

by testifying "about their actual belief of imminent danger."[27] The Ninth Circuit reasoned that the trial court judge "merely regulated the admission of evidence, and his commentary as to what evidence might constitute a foundation did not infringe on [the defendants'] right to decide whether to testify."[28] The court distinguished the Supreme Court's decision in <u>Brooks v. Tennessee</u>, which invalidated a statute that compelled a defendant to testify first if at all,[29] noting that unlike a defendant under the Tennessee statute, the defendants "had the opportunity, at every stage of the trial, to decide whether or not to take the stand."[30]

Here, unlike in <u>Brooks</u>, no statute or rule compelled Melendrez to testify first or at all. In fact, three of six defense witnesses testified before him. Melendrez argues that the trial court specified the order of his witnesses and "forced him to testify in order to admit relevant evidence," but that begs the question. Like the trial court in <u>Menendez</u>, the trial court here ruled that the misbehavior evidence Melendrez sought to admit was <u>not</u> relevant unless Melendrez laid a foundation by presenting evidence that he knew about the misbehavior. One way, but not the only way, Melendrez could do so was by testifying himself. In so ruling, the trial court properly used its discretion to

---

[27] <u>Menendez</u>, 422 F.3d at 1030-31.
[28] <u>Menendez</u>, 422 F.3d at 1032; <u>see also</u> <u>Johnson</u>, 594 F.3d at 613.
[29] 406 U.S. 605, 607, 92 S. Ct. 1891, 32 L. Ed. 2d 358 (1972).
[30] <u>Menendez</u>, 422 F.3d at 1031.

"exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence."[31]  We therefore reject Melendrez's Fifth Amendment argument.

<u>Sufficiency of the Information and Denial of Bill of Particulars</u>

Melendrez next contends that because the information covered long periods, giving him little information about when the alleged crimes occurred, he could not effectively defend against the charges with an alibi.  Melendrez did present evidence that he worked the night shift at Microsoft and was dependable in showing up for work to counter R.M.'s testimony that Melendrez frequently raped her at night and eventually moved her into his bedroom.

An information that accurately states the elements of the crime charged is not constitutionally defective.[32]  The information must also allege facts supporting those elements.[33]  This requirement's purpose "'is to give notice to an accused of the nature of the crime that he or she must be prepared to defend against.'"[34]

Melendrez makes no claim that the information omits any element of any crimes charged.  Instead he argues that the information was not specific enough about the time period in count I to provide him with adequate notice.  But in child

---

[31] ER 611(a).

[32] <u>State v. Bonds</u>, 98 Wn.2d 1, 17, 653 P.2d 1024 (1982); <u>State v. Zillyette</u>, 178 Wn.2d 153, 158, 307 P.3d 712 (2013).

[33] <u>State v. Nonog</u>, 169 Wn.2d 220, 226, 237 P.3d 250 (2010).

[34] <u>Zillyette</u>, 178 Wn.2d at 158-59 (quoting <u>State v. Kjorsvik</u>, 117 Wn.2d 93, 101, 812 P.2d 86 (1991)).

sex abuse cases, "whether single or multiple incidents of sexual contact are charged, a defendant has no due process right to a reasonable opportunity to raise an alibi defense."[35] Alibi is not likely to be a valid defense where, as here, "'the accused child molester virtually has unchecked access to the victim,'" because in such cases "'[t]he true issue is credibility.'"[36]

Melendrez relies on a South Carolina case, State v. Baker,[37] where the court held an indictment to be unconstitutionally overbroad. There, the State amended the information two weeks before trial to enlarge by over three years the period when the defendant committed alleged child abuse.[38] The defendant's only available complete defense was alibi. The court ruled that the late amendment of the charging instrument made that defense impossible.[39]

Baker is the only authority Melendrez cites for the proposition that a long charging period can violate a defendant's constitutional rights. But apart from being nonbinding authority, Baker is distinguishable. Unlike the defendant in Baker, Melendrez had ample notice of the charges and the period they encompassed. The amended information did not change the charging period; it simply combined the periods for counts I and II and eliminated count II.

---

[35] State v. Cozza, 71 Wn. App. 252, 259, 858 P.2d 270 (1993).
[36] State v. Hayes, 81 Wn. App. 425, 433, 914 P.2d 788 (1996) (quoting State v. Brown, 55 Wn. App. 738, 748, 780 P.2d 880 (1989)).
[37] 411 S.C. 583, 769 S.E.2d 860, 865 (2015).
[38] Baker, 769 S.E.2d at 864.
[39] Baker, 769 S.E.2d at 864.

Melendrez knew for nearly two years before trial that he had to defend against charges that he raped his daughter during the 16-month period described in the amended count I.[40]   Thus, the information satisfied constitutional notice requirements.[41]

Melendrez also contends that even if the information was not deficient, the trial court abused its discretion in denying Melendrez a bill of particulars because without it he could not adequately prepare a defense.

An information may be constitutionally sufficient but still so vague as to make it subject to a motion for a more definite statement.[42]   A trial court should grant a bill of particulars if the defendant needs the requested details to prepare a defense and to avoid "prejudicial surprise."[43]   If the bill of particulars is not necessary, then the trial court does not abuse its discretion in denying it.[44]

In State v. Noltie,[45] this court rejected challenges to an information with a lengthy charging period and the denial of a bill of particulars, holding the defendant had adequate notice of the charges against him.   The charges

_____

[40] The first information is dated March 2012; the trial began in January 2014.
[41] See Zillyette, 178 Wn.2d at 158.
[42] Bonds, 98 Wn.2d at 17; Dictado, 102 Wn.2d at 286.
[43] State v. Allen, 116 Wn. App. 454, 460, 66 P.3d 653 (2003) (quoting 1 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 129 (3d ed.1999)).
[44] Dictado, 102 Wn.2d at 286.
[45] 57 Wn. App. 21, 30, 786 P.2d 332 (1990), aff'd, 116 Wn.2d 831, 841-42, 809 P.2d 190 (1991).

"spanned a 3-year period and presented a pattern of frequent and escalating abuse" of the defendant's stepdaughter.[46] The defendant claimed he lacked adequate notice to prepare a defense because the information was too vague for him to "separate the charged acts from the 'hundreds of innocent contacts' he had with [the victim] during the charging period."[47] This court rejected that argument, noting the defendant had an opportunity to interview the complaining witness. The court also noted that the defendant did not point to any "information that surprised him at trial[ ] that would have provided additional notice of the charges."[48] The court concluded that the trial court did not abuse its discretion.[49]

Here, as in Noltie, the charges did not surprise the defendant, even without a bill of particulars.[50] Like Noltie, Melendrez's counsel interviewed the complaining witness, R.M., at length and in advance of trial. And like Noltie, Melendrez fails to point out any information that would have given him additional notice of the charges. His only specific contention as to prejudice is that he lacked the dates he needed to present an alibi defense. But "a defendant has no due process right to a reasonable opportunity to raise an alibi defense" against a charge of child sex abuse.[51] And as the State points out, the period over which

---

[46] Noltie, 116 Wn.2d at 845.
[47] Noltie, 57 Wn. App. at 30.
[48] Noltie, 57 Wn. App. at 31.
[49] Noltie, 57 Wn. App. at 31.
[50] Noltie, 116 Wn.2d at 845.
[51] Cozza, 71 Wn. App. at 259.

the alleged crimes took place didn't change with the amendment, which merely combined counts I and II. Melendrez thus failed to show how a bill of particulars would have helped his defense. The trial court did not abuse its discretion in denying a bill of particulars.

Expert Testimony

Next, Melendrez contends that Nurse Dippery's testimony that she would not be surprised to see part of the hymen intact on a 16-year-old girl who had had sex over 100 times "was highly speculative and lacked foundation."

ER 702 permits "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify where her "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."

Melendrez again fails to cite the facts of any case that would support a reversal. He also fails to explain how Dippery's statement lacked a foundation. Dippery testified to her extensive qualifications: seven years examining patients at Harborview Medical Center for signs of sexual assaults and around 900 sexual assault examinations performed, roughly half of them on teenagers. She testified without objection that it is "possible for someone to have a relatively intact hymen, even after sexual activity" and that R.M.'s was partially intact. The trial court could reasonably conclude Dippery was qualified to make the challenged

statement and that the statement would "assist the trier of fact to understand the evidence" gained in R.M.'s sexual assault exam.[52] The trial court did not abuse its discretion in overruling Melendrez's ER 702 objection.

<u>Right to a Fair Trial</u>

Melendrez next asserts that the trial court violated his right to a presumption of innocence by asking the bailiff in the jury's presence, "Is the jail able to staff until 4:30 tomorrow afternoon?"

"The right to a fair trial includes the right to the presumption of innocence."[53] This includes "'the physical indicia of innocence,'" i.e., freedom from shackles or other restraints.[54] It also precludes a court from deliberately drawing the jury's attention to a defendant's custody with a preliminary instruction.[55] Such violations are subject to harmless error analysis.[56]

In <u>State v. Gonzalez</u>,[57] Division Three of this court held that a trial court's "special announcement" informing the jury the defendant "was indigent, incarcerated, had been transported in restraints, and was being tried under guard" violated the defendant's right to a fair trial. In <u>State v. Escalona</u>,[58] this

---

[52] <u>See</u> ER 702.

[53] <u>Gonzalez</u>, 129 Wn. App. at 900.

[54] <u>Gonzalez</u>, 129 Wn. App. at 901 (quoting <u>State v. Finch</u>, 137 Wn.2d 792, 844, 975 P.2d 967 (1999)).

[55] <u>Gonzalez</u>, 129 Wn. App. at 901.

[56] <u>Finch</u>, 137 Wn.2d at 859.

[57] 129 Wn. App. 895, 901, 129 P.3d 645 (2005).

[58] 49 Wn. App. 251, 255-56, 742 P.2d 190 (1987).

court ruled that the defendant's right to a fair trial was violated where the victim disclosed that the defendant had previously been convicted of an identical crime to the one he was on trial for. In contrast, in State v. Condon,[59] this court held that a witness twice mentioning that the defendant had been in jail did not violate the defendant's right to a fair trial. The trial court admonished the witness, denied the defendant's motion for a mistrial, and gave the jury a curative instruction.[60] This court reasoned that the references to the defendant's custody were more ambiguous and thus less prejudicial than the statements in Escalona.[61] The Condon court also pointed out that being in jail does not necessarily mean the defendant has a propensity to commit murder or has been convicted of a crime.[62] It held that the statements were not serious enough to merit a mistrial and the trial court's instruction cured their "potential for prejudice."[63]

Melendrez again fails to cite any case in his favor. He bore no physical indicia of being in custody. And unlike the trial court in Gonzalez, the trial court here did not explicitly and intentionally call the jury's attention to Melendrez's custodial status. Rather, it made a comment that it reasonably concluded was

---

[59] 72 Wn. App. 638, 649-50, 865 P.2d 521 (1993).
[60] Condon, 72 Wn. App. at 648.
[61] Condon, 72 Wn. App. at 648.
[62] Condon, 72 Wn. App. at 649.
[63] Condon, 72 Wn. App. at 649-50.

ambiguous in denying Melendrez's motion for a mistrial. As both the trial court and the State note, the jury could infer from the judge's question that Melendrez was in custody, but it could just as easily think jail staff was responsible for courtroom security. And even an implication of custody would not warrant reversal unless it was particularly prejudicial, like the testimony in Escalona.[64] The trial court's fleeting, inadvertent, and ambiguous comment did not abridge Melendrez's presumption of innocence.

## Manifestly Apparent Legal Standard

Melendrez contends that the trial court failed to make the relevant legal standard "manifestly apparent" in answering the jury's question of whether it needed to "point to a specific incident or just agree an act occurred during" the charging period for count IV. This, Melendrez argues, warrants reversal of his conviction on that count, as the trial court should have told the jury it needed to agree on a specific incident in order to find Melendrez guilty.

"Jury instructions must make the relevant legal standard manifestly apparent to the average juror."[65] Melendrez cites State v. Cantabrana,[66] in which the court found reversible error in a jury instruction that was wrong about the law. But he does not cite any case in which a legally accurate jury instruction failed to

---

[64] See Condon, 72 Wn. App. at 648.
[65] State v. Cantabrana, 83 Wn. App. 204, 208, 921 P.2d 572 (1996).
[66] 83 Wn. App. 204, 208-09, 921 P.2d 572 (1996).

"make the relevant legal standard manifestly apparent." Nor does he contend that the trial court's original instruction or response to the jury's question were incorrect.

Moreover, the trial court's instructions did "make the relevant legal standard manifestly apparent to the average juror." This court held in State v. Moultrie[67] that an almost identical Petrich[68] instruction adequately addressed the legal standard for the average juror. In arguing that "[t]he jury's question indicated that it did not understand the instruction," Melendrez misunderstands the "manifestly apparent" test. The subjective understanding of the jurors in Melendrez's case is irrelevant because the test is objective. The instruction only has to make the standard "manifestly apparent to the average juror,"[69] and in Moultrie this court found that an almost identical instruction did so.[70]

---

[67] 143 Wn. App. 387, 392, 177 P.3d 776 (2008). The instruction in Moultrie read in part,

> To convict the defendant of rape in the second degree, one particular act of rape in the second degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of rape in the second degree.

[68] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984).
[69] Cantabrana, 83 Wn. App. at 208 (emphasis added).
[70] See Moultrie, 143 Wn. App. at 394.

Issues Raised in Statement of Additional Grounds for Review

Melendrez raises several more issues in his statement of additional grounds for review. Each of these lacks merit. First, Melendrez contends the trial court failed to properly address evidence discovered during trial, violating his rights to due process and a fair trial. An error by a trial court resulting in a failure to disclose relevant evidence does not warrant reversal unless the exculpatory evidence was constitutionally material.[71] Evidence is not constitutionally material if the defendant was able to obtain the substantial equivalent of the evidence and use it to cross-examine the witness.[72] Here, the State spoke to R.M. during a trial recess and gave Melendrez a summary of its notes. The interview contained two items of information the defense thought was relevant.[73] The trial court noted that this information could be used on cross-examination and "elicited, if relevant, for contradictory testimony." Melendrez does not allege the State failed to disclose any relevant information. And the asserted "delay" in the State reporting the interview was reasonable as it was between a Friday afternoon and the following Monday morning. We reject Melendrez's first pro se argument.

---

[71] State v. Garcia, 45 Wn. App. 132, 139, 724 P.2d 412 (1986).
[72] Garcia, 45 Wn. App. at 140.
[73] Those items were an acknowledgment that R.M. had oral sex in the apartment complex restroom and a statement that her father at times rewarded her with food for sex.

Second, Melendrez claims that because R.M.'s testimony at trial was inconsistent with her previous formal statements, the State made "knowing use of perjured testimony," warranting reversal, quoting State v. Larson.[74] Melendrez has not shown, and the record does not support, that R.M. lied in her trial testimony or that the State knew any of her testimony to be false.[75] Melendrez was able to thoroughly cross-examine R.M. about her inconsistent statements. Whether R.M. lied at trial was a question of credibility properly left to the jury.[76] We therefore reject Melendrez's second argument.

Third, Melendrez contends that the trial court abused its discretion in ruling irrelevant the identity of the boy R.M. was caught in a restroom with. Melendrez argues that the trial court's ruling denied him the ability to question the boy and that the boy's testimony would have helped establish R.M.'s bias against her father.

"[A] defendant has a constitutional right to impeach a prosecution witness with bias evidence" using an independent witness.[77] An error in excluding such evidence is harmless if "no rational jury could have a reasonable doubt that the defendant would have been convicted even if the error had not taken place."[78]

---

[74] 160 Wn. App. 577, 594, 249 P.3d 669 (2011).
[75] See Larson, 160 Wn. App. at 594.
[76] See Larson, 160 Wn. App. at 594-95.
[77] State v. Spencer, 111 Wn. App. 401, 408, 45 P.3d 209 (2002).
[78] Spencer, 111 Wn. App. at 408.

Melendrez offers only one theory about the relevance of the boy's identity, that the boy could have information about R.M.'s "behavior-based issues." As noted above, the trial court properly limited evidence of R.M.'s behavior to events known to Melendrez. Melendrez does not explain how the boy could be unknown to him, yet know about behavior that Melendrez was aware of. But we need not decide whether the trial court erred in denying Melendrez the ability to introduce testimony from the boy because any error in doing so was harmless. "[N]o rational jury could have a reasonable doubt" that Melendrez would have been convicted even if the trial court had not excluded evidence of the boy's identity. Melendrez presented ample evidence of R.M.'s potential bias without the boy. And R.M.'s testimony, along with the DNA evidence, would have been unchanged.

Next, Melendrez contends that the trial court erred in allowing the State to ask D.M. questions that suggested D.M. was being untruthful. D.M. testified that R.M. told him before their father's arrest that she was planning to lie about their father abusing her. The trial court allowed the State to ask D.M. whether he had been formally interviewed about his knowledge of the alleged crimes. D.M. replied he had not. The State then asked, without objection by Melendrez, whether D.M. ever told anyone, "'My sister told me she's going to make this up.'" D.M. again replied he had not.

"'[A] prosecutor who asks the accused a question that implies the existence of a prejudicial fact must be prepared to prove that fact.'"[79] Melendrez asserts that the State implied the "prejudicial fact" that D.M. had interacted with the authorities after his father's arrest. Melendrez claims this prejudiced him because D.M. may not have had any interaction with those authorities and thus no opportunity to tell them what his sister had said. This was the subject of a lengthy colloquy in the trial court, in which the parties and the judge agreed the problem would be addressed if the State first asked whether any such conversations happened. This was exactly what the State did, without objection. Melendrez's argument at this stage is therefore meritless.

Finally, in its closing argument, the State said D.M. "didn't tell anybody" that R.M. told him she was going to lie "because it didn't happen." Melendrez contends that the trial court erred in allowing the State to directly state in closing that D.M. testified untruthfully.

A "defendant's right to a fair trial is denied when the prosecutor makes improper comments and there is a substantial likelihood that the comments affected the jury's verdict."[80] But "[t]he State is generally afforded wide latitude in

---

[79] State v. Babich, 68 Wn. App. 438, 444, 842 P.2d 1053 (1993) (quoting United States v. Silverstein, 737 F.2d 864, 868 (10th Cir.1984)).

[80] State v. Jungers, 125 Wn. App. 895, 901, 106 P.3d 827 (2005).

making arguments to the jury."[81] A prosecutor can "draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence" but cannot opine about a witness's credibility.[82] The State's remark during closing arguments was not an opinion about D.M.'s credibility. Rather, the prosecutor asserted a reasonable inference based on the evidence in the case as a whole and on D.M.'s statements on cross-examination in particular.

## CONCLUSION

Because Melendrez did not raise his Sixth Amendment challenge below and he does not show a manifest error, we decline to review it. Because the trial court did not force Melendrez to testify first and properly exercised its discretion to exclude irrelevant evidence and control the order of testimony, we reject Melendrez's Fifth Amendment claim. Because Melendrez had ample notice of the charges against him and there was no chance of "prejudicial surprise," the charging information was constitutionally adequate and the trial court did not abuse its discretion in denying Melendrez a bill of particulars. Because Melendrez makes no argument about Nurse Dippery's qualifications to present her expert opinions, he fails to show that the trial court abused its discretion in allowing her testimony. Because the trial court's question in the jury's custody

---

[81] State v. Gregory, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), overruled in part on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014).

[82] State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

-27-

was fleeting, inadvertent, and ambiguous, it did not abridge Melendrez's presumption of innocence. Because this court has already upheld a substantively identical <u>Petrich</u> instruction, the trial court's instruction made the legal standard "manifestly apparent to the average juror." And Melendrez's several pro se arguments are equally meritless. For all these reasons, we affirm.

_Leach, J._

WE CONCUR:

_Dwyer, J._     _Trickey, J._

-28-