# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

In the Matter of the Marriage of

JOSEPHENE CHOI,

                 Respondent,

and

NATHAN CHOI,

                 Appellant.

No. 78383-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 22, 2019

LEACH, J. — Nathan Choi appeals a number of orders entered in this parenting plan modification proceeding. He claims that the trial court did not have authority to consider Josephene Choi's request for modification, that Ms. Choi did not demonstrate a substantial change in circumstances, and that venue should have been transferred to a different county. Because Mr. Choi's claims lack merit, we affirm.

## BACKGROUND

On December 12, 2014, Nathan and Josephene Choi filed a joint petition for dissolution of their marriage.[1] The trial court appointed a guardian ad litem (GAL) to evaluate the relationship between them and their three children.[2] The

---

[1] For clarity, this opinion refers to the parties by their first names.
[2] The trial court appointed Alan Ruder twice, first during the initial dissolution and then again after filing of the petitions for modification of the parenting plan.

case proceeded to trial. Both the GAL and the judge hearing the trial found that both parents lacked credibility, which complicated their respective tasks. The trial court found that both parents engaged in "offsetting offenses of 'abusive use of conflict.'" It adopted a final parenting plan that placed primary residential care with Nathan but did not impose any RCW 26.04.191 restrictions on Josephene. The trial court also rejected Nathan's request to relocate the children to Hawaii because he did not make it in good faith.[3]

On May 18, 2016, the Bellevue Police Department responded to a 911 call from the parties' middle child reporting that Nathan had pushed their oldest child, whose head struck a wall. The police arrested Nathan for allegedly assaulting the oldest child.

The trial court's unchallenged findings describe the events immediately after Nathan's arrest. "On May 19, 2016, [Josephene] filed a petition for a domestic violence protection order [DVPO] to protect herself and the three children, which was granted on a permanent basis July 21, 2016. On June 30, 2016, [Josephine] filed a petition for modification of the parenting plan."[4] The DVPO suspended the parenting plan.

---

[3] This court earlier affirmed the trial court's final parenting plan, denial of motion for relocation, and decree of dissolution in In re Marriage of Choi, No. 74569-7-I (Wash. Ct. App. Apr. 24, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/745697.pdf, review denied, 189 Wn.2d 1032 (2018).

[4] On its order for adequate cause, the court states that Josephene "filed a petition for modification in 2016 with no case schedule ever generated."

Next, Josephene served notice of the petition for modification and summons on Nathan. On July 15, Nathan filed a response to Josephene's petition. On January 25, 2017, Nathan filed a petition for modification of the parenting plan.

The parties moved for adequate cause. On May 10, 2017, the trial court found adequate cause "based upon both parties."[5] Nathan did not seek a revision of the adequate cause ruling. He did not attend the June 16, 2017, status conference where the court found that it did not need to address any additional issues at trial.

The trial court reappointed the GAL, who then prepared a report for the March 2018 trial. A commissioner granted Nathan's motion to terminate the DVPO on January 18, 2018. But because the GAL reported that the children feared their father, the trial court ordered that they remain with their mother. It also restrained Nathan from contacting the children.

On February 23, 2018, the court granted Nathan's request to dismiss his modification petition. It denied as untimely his request for a trial continuance because he "had at least 14 months to complete discovery [and] chose not to seek any relief from the court for discovery issues until three weeks before trial." On March 13, 2018, in response to Nathan's motion for recusal, Judge Craighead replaced Judge Thorp as the trial judge.

---

[5] Nathan left without signing the adequate cause order.

The case proceeded to a four-day trial in March 2018. After the close of testimony, Nathan asked for a change of venue. The trial court granted Josephene's request to modify the parenting plan. It made findings of fact and conclusions of law supporting its decisions, adopted a modified parenting plan placing primary residential care with Josephene, and denied Nathan's request to change venue. The trial court also found that Nathan should have no contact with the parties' children or participate in making decisions on their behalf until his "mental health issues have been diagnosed, treated, and remedied."

Finally, because Nathan "has filed numerous motions, serial relocation requests, and several other cases related to the children since the dissolution trial," the trial court restrained Nathan from filing "motions in this case or other new cases involving his children other than a motion for reconsideration and an appeal." It stated, "If he fails to comply with this order, the Court will strongly consider entering an order construing him to be a vexatious litigant, which will restrict his ability to file electronically."[6]

Nathan appeals.

## ANALYSIS

Nathan identifies three issues in his assignments of error. First, he claims that the trial court did not have authority to modify the parenting plan because Josephene did not file a petition to modify and the trial court did not make a

---

[6] The court also stated, "[Mr. Choi] has submitted documents and exhibits that either were not what they purported to be or where he forged signatures."

finding that she had demonstrated adequate cause. Next he claims that the record does not establish any "significant change in circumstance." Finally, he challenges the denial of his request for a change of venue.

### The Trial Court Had Authority To Modify

Nathan contends that the lower court should not have modified the parenting plan because, he claims, Josephene never filed a petition for modification and the trial court did not make an adequate cause finding for her request. This court reviews a challenge to the trial court's decision-making authority de novo. Nathan's challenge to the court's authority fails.

First, Nathan has not challenged any of the trial court's findings of fact. So we accept them as true for this appeal.[7] The trial court's order on adequate cause includes a finding that Josephene "filed a petition for modification in 2016 with no case schedule ever generated." In findings made in a February 23, 2018, order denying Nathan's continuance request, the trial court stated that Nathan was "well aware that both Petitions [his and Josephene's] are before the court for trial." Finally, the trial court's April 13, 2018, findings of fact, made after trial, state that "[o]n June 30, 2016, [Josephene] filed a petition for modification of the parenting plan."

Second, Nathan filed a response to Josephene's petition, which did not raise this issue, thus waiving any claim of procedural defect. As noted by the trial

---

[7] In re Marriage of Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999).

court in its February 23, 2018, findings, "To claim otherwise is disingenuous given Respondent's own actions to file a Response" to Josephene's petition."

Nathan also contends that the trial court did not make the adequate cause finding required for the case to proceed to trial on Josephene's request to modify the parenting plan. RCW 26.09.270 requires that a court make a finding of adequate cause before it may modify an existing parenting plan that governs residential time with a child.

The record belies Nathan's position. The trial court found adequate cause because "[t]he parenting plan entered following trial was suspended in 2016 by a Domestic Violence Order for Protection" and "both parties assert the need for the trial court to determine the best interest of the children." Nathan does not challenge these findings, so we consider them true. They reflect a finding of adequate cause for each parent's modification request.

Nathan contends that he filed his petition for modification in response to the DVPO and once the court dissolved the DVPO, it permitted him to withdraw the petition. So, he claims, there was nothing for the trial court to consider. But he identifies nothing in the record that supports his contention.[8] Instead, he discusses the DVPO and his criminal assault trial, contends that the "sole purpose of [Josephene's lawyer's] representation is devious," discusses the hearing to terminate the DVPO, and brings up Josephene's request for a five-

_____

[8] Nathan's citations to the record are few and are generally irrelevant to the point he is making. Also, the record he filed is incomplete and does not include full records of the proceedings to which he refers.

year no-contact order from the City of Bellevue.  None of this addresses whether the trial court made the required adequate cause finding.

Nathan does not establish that the trial court lacked the authority to modify the parenting plan.

### The Court Properly Found a Substantial Change in Circumstances

Nathan contends that the court should not have modified the parenting plan because Josephene did not prove a "significant change in circumstance." Specifically, he asserts that the only change in circumstance shown was the issuance of the DVPO against him.  So, he claims, when the court terminated the DVPO, any change in circumstances disappeared.

This court reviews parenting plan decisions for manifest abuse of discretion.[9]  Only if the trial court makes a manifestly unreasonable decision or bases its decision on untenable grounds or untenable reasons does it abuse its discretion.[10]  The appellant bears the "'heavy burden of showing a manifest abuse of discretion.'"[11]

RCW 26.09.260 governs modification of parenting plans.[12]  This statute requires that a court find a substantial change in the circumstances of the child or the nonmoving party before modifying a parenting plan.  The court must also find

---

[9] In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014); In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).
[10] Chandola, 180 Wn.2d at 642; Katare, 175 Wn.2d at 35.
[11] In re Marriage of Kim, 179 Wn. App. 232, 240, 317 P.3d 555 (2014) (quoting In re Marriage of Landry, 103 Wn.2d 807, 809, 699 P.2d 214 (1985)).
[12] Bower v. Reich, 89 Wn. App. 9, 14, 964 P.2d 359 (1997).

that modification is necessary for the best interests of the child.[13]  The court may alter the residential schedule if "[t]he child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child."[14]

As noted earlier, Nathan has not assigned error to the trial court's findings. An appellate court treats unchallenged findings as true on appeal.[15]

The trial court's uncontested findings include the following:

3.     On April 9, 2016, Pastor Yung Cho received an email from J.E.C.[16]  The children had attended Mr. Cho's church when they were living with their mother and the young man evidently perceived Pastor Cho as someone he could rely upon.  In his email, J.E.C. told Pastor Cho that he and his sisters were not getting enough food and that they were scared of their father.

4.     After contacting the police the next day, Pastor Cho went to the home to investigate.  Mr. Choi was not there. The children showed him around the home.  Pastor Cho described the kitchen as very dirty and the overall condition of the home to be "alarming."

5.     He talked with the girls, who he said were not doing well and were very scared of their father.

6.     Mr. Choi arrived home.  He was very upset to see the pastor there, and contradicted his children's report by saying he was doing a good job caring for them.  He did not seem

---

[13] RCW 26.09.260(1).

[14] RCW 26.09.260(2)(c).

[15] Brewer, 137 Wn.2d at 766.

[16] The parties' son, their oldest child.  For purposes of this opinion, the children's names are redacted and replaced by initials without including punctuation to avoid repetition.  Similarly, the mother will be referred to as Josephene throughout the findings.

concerned that the children were afraid of him. Eventually he told the pastor to leave his property or Mr. Choi would shoot him. Fortunately, the police arrived and took over.

7.    As Pastor Cho was leaving, the children were in tears and looked scared. He was very afraid of what might happen to them when they were alone again with their father.

. . . .

9.    The Choi children next came to the attention of the authorities when Josephene brought J.E.C. to the emergency room April 21, 2016, due to pain in his pinky finger. Apparently, he had been injured when he and his father were tussling over a laptop computer and Mr. Choi closed the cover on J.E.C.'s finger. The finger was sprained.

10.    On April 29, 2016, Mr. Choi appeared at J.E.C.'s school and tried to pick him up even though it was Josephene's day to pick him up. J.E.C. did not want to go with him. The school principal saw Mr. Choi physically pulling his 14-year-old son as J.E.C. held on to the door jam. The principal intervened and sent the boy to her office, while telling Mr. Choi that he could not do that to his son. It was her impression that J.E.C. was afraid of his father.

11.    On May 5, 2016, the children came back from an evening with their mother. He accused them of being "traitors" and asked what they had done with the "wicked witch."

. . . .

13.    On May 18, 2016, H.H.Y.C.[17] called 911 to report that Mr. Choi had pushed J.E.C., whose head struck a wall. The GAL, as well as the police, interviewed all three children separately about this incident, and in both set[s] of interviews, the children's accounts were consistent with one another and inconsistent with Mr. Choi's account. Child Protective Services considered this a "founded" referral.

14.    On this date, Mr. Choi had brought fried chicken home for the children and then went to his room. When he came out he became upset because they were eating the chicken in rooms other than the kitchen. He ended up gathering the

---

[17] The parties' middle child, a daughter.

children in J.E.C.'s room. Mr. Choi said negative things about their mother, including calling her an "adulterer." H.Y.U.C.[18] stood up for their mother and an argument ensued between the girls and their father. The GAL reported that Mr. Choi pushed H.Y.U.C.'s neck and snatched H.H.Y.C.'s glasses and pulled her nose.

15. According to the children's report to the GAL, Mr. Choi left the room, supposedly to call his lawyer to find out if it was okay for him to hit the children. As they heard him outside the room on his cell phone, they blocked the door with a piece of furniture.

16. Eventually, Mr. Choi was able to enter the room and was threatening to hit the girls. J.E.C. told his father to stay away from the girls. According to the children, Mr. Choi pushed J.E.C. to the floor. When the young man got back up, Mr. Choi pushed him back against the bed resulting in J.E.C. hitting his head on the wall. Once Mr. Choi left the room, 911 was called.

17. As it happened, while the police cars and ambulance were at the house, the children's longtime violin teacher, Young Moon Chung, was driving by the house. He stopped and tried to comfort the two girls, who appeared to him very scared. They told him a story consistent with what they told the GAL and the police. He called Josephene, who had already been contacted and was on her way. He then went on his way.

18. When the police arrived, they found three frightened children who opened the door for them. The girls were bear-hugging stuffed animals. J.E.C. was looking over his shoulder and down the hall. He told them he was scared of his father. He reported that when his head hit the wall his vision "flashed white" and he became dizzy and his ears "sort of rang." The officer noted that, despite no visible injury, J.E.C. appeared slightly disoriented, off-balance, and short of breath.

19. Mr. Choi was home, but took his time coming to the front door. The police saw him through the window. J.E.C. was being treated by the medics and they told police he had a very high blood pressure, which could indicate a concussion. Mr. Choi asked if J.E.C. was okay, because he was

---

[18] The parties' youngest child, also a daughter.

"worried." After questioning Mr. Choi, the police arrested him.

. . . .

25. The children told the GAL that Mr. Choi tried to keep them apart by sending them to their rooms. Mr. Choi himself was often holed up with Ms. Wang [Nathan's girlfriend] in his home office. They said he did not prepare meals, so J.E.C. warmed up frozen burritos. It fell to J.E.C. to get the girls off to school. They were often hungry.

. . . .

29. The children—especially J.E.C.—were very close to their dog, Coco. As a form of discipline; Mr. Choi would threaten to take the dog to the pound. On one occasion Mr. Choi actually drove J.E.C. and the dog to the pound in an attempt to discipline him.

30. Gifted musicians, the children were not allowed to practice their instruments at home. Mr. Choi terminated their private lessons. He would not allow them to participate in sports, extra-curricular activities, or have tutoring.

31. Once they were placed with their mother, Mr. Chung resumed music lesson with them. He testified that initially the girls were "grumpy," but with time they are returning to their old selves. The youngest girl did not smile for six months and had become very quiet, where she used to be effusive.

32. The children have not seen their father since the May 18, 2016, incident except for at the criminal trial. It should be noted that Mr. Choi was acquitted.

. . . .

35. A petition for non-parental custody was filed July 29, 2016 (case no. 16-3-04629-4-KNT), supposedly by Mr. Choi's mother. He testified that his mother gave him permission to sign her name to the petition. This was a petition in which the mother had to allege that both parents were unfit. This would be a mechanism to move the children to Hawaii, which is what Mr. Choi really wanted.

36. A pro tern Commissioner signed an ex parte temporary order allowing for placement of the children with the grandmother. Much was made at trial about language in the order providing for a civil standby to allow the children and their belongings to be collected. Josephene's attorney asserted that this language was included in the order after the Commissioner signed it. This Court reviewed the hearing on FTR[19] and determined that the Commissioner in fact did order the children to be picked up with a civil standby. It is not clear that this was a lawful order, but the Court finds that Mr. Choi did not add language to the order without the Commissioner's knowledge.

37. That said, the way Mr. Choi and his mother executed this order was completely inappropriate. The first Josephene heard of this order was when a man pounded on her door one night announcing he was there to pick up the children. Mr. Choi's mother was present, the first time she had come to Seattle. The man turned out to be a friend of Mr. Choi's acting as a process-server. The children and the mother were terrified and called the police. The police eventually sorted things out and the children stayed with their mother, but a lot of damage was done to their sense of security. The next day Josephene and her attorney went to court to address the issue. The petition for non-parental custody was dismissed.

38. On May 12, 2016, Mr. Choi filed a petition for a Sexual Assault Protection Order [SAPO] against Josephene's parents (case no. 16-2-11366-4 KNT). The allegation was salacious, and as near as this Court can tell, completely false. When the SAPO petition was dismissed in one courthouse, Mr. Choi then filed for a DVPO in the other courthouse on May 20, 2016 (case no. 16-2-11898-4 SEA). Both actions were dismissed.

39. Various issues arose at trial that raised significant questions about Mr. Choi's veracity, judgment, and mental health. Judge Downing noted many concerns regarding Mr. Choi's veracity. Since the trial, Mr. Choi admitted to selling the family home (worth about $2 million) to Ms. Wang, in exchange for $200-300,000 in cash. Other than perhaps constituting an effort to evade creditors, this transaction would appear to make little sense and certainly does not

---

[19] King County audio recording system, For The Record.

-12-

contemplate stability for the children. It appeared both from Ms. Wang's testimony and the Court's observation that Ms. Wang did not sign the form indicating that the sale was exempt from excise tax. As Mr. Choi was awarded the home in the dissolution its subsequent sale was not exempt from excise tax. In fact, Mr. Choi admitted to failing to pay business or personal income tax since moving to Washington. He also admitted to purchasing and registering his cars in Oregon to avoid paying Washington taxes.

. . . .

41. This Court agrees with Judge Downing that neither parent is a great role model for the children. The GAL is concerned, as was Judge Downing, that the children do not feel compelled to tell the truth. That said, at this point the children do not want to return to Mr. Choi's care. Their accounts of the May 18, 2016 incident are credible. In the circumstances of that incident, it does not appear to the Court that Josephene could have orchestrated the entire event and coached the children about what to say. Thus Josephene's credibility, while questionable, is not as important in this trial as it was in Judge Downing's trial. What is important is the credibility of the children and Mr. Choi.

42. Mr. Choi was confronted with statements by J.E.C. that he had seen unsecured firearms in Mr. Choi's room. Mr. Choi admitted to having three firearms on the premises. He testified under oath that he purchased firearms in Washington and sent them to people in Hawaii without any kind of background check on his Hawaiian customers. The children's fear of Mr. Choi is better understood in light of the firearms in the house.

43. J.E.C.'s diary is very revealing on the subject of Hawaii.[20] He comments that his father was always talking about moving back to Hawaii, where everything would be perfect and the children would live in a waterfront home. He would go on and on about the beaches and the weather and how

---

[20] The trial court stated in finding 12 that it was "wary of relying on it [the diary] too much because it could have been written by" Josephene. But, it goes on to state, "[A]fter reading it, this Court concurs with the GAL that it reads like a teenager with good writing skills who wrote the diary contemporaneously with the events."

he could once again make plenty of money. He told J.E.C. that they could move to Hawaii if only his mother would agree.

44. At trial, there were moments when Mr. Choi's *pro se* cross-examination became bizarre, such as when, out of the blue, he asked the mother about the occasion when H.Y.U.C. was hit in the head with a pick ax. Josephene appeared mystified. Mr. Choi sorted through papers for some time attempting to prove up this allegation, but was unable to do so.

45. Mr. Choi testified at trial, both on "direct" and cross-examination. Since he was representing himself, he was allowed to simply tell the Court what he wanted it to know, subject to objections. What followed was lengthy testimony that can best be described as "stream of consciousness." Mr. Choi jumped from one topic to another, focusing primarily on the mother's lack of credibility and her flaws as a parent. These issues are valid and were addressed extensively by Judge Downing. Mr. Choi acknowledged feeding the children "bad food." In describing the May 18th incident, Mr. Choi giggled as he recalled how H.H.Y.C. appeared after he twisted her nose—she looked "like Rudolph."

46. Mr. Choi testified that he was devastated by Judge Downing's decision not to let him relocate with the children to Hawaii, where his business prospects were brighter. He realized that he would have to cut back on his spending when it became clear he had to stay in Washington. As a result, he could not pay for lessons for the children, take them out for meals, or buy them gifts. He resented the fact that Josephene was still able to be generous with the children.

47. Mr. Choi's presentation of his case was very disorganized. He claimed that he was surprised to be going to trial, thinking that the Court would grant a last minute continuance. Allegedly because he was surprised, he failed to subpoena a witness he thought would be important until Saturday, March 10, 2018, despite the fact that the witness would be flying in from Hawaii. In an effort to ensure Mr. Choi got a fair trial, the Court admitted in evidence the testimony of Gianna Kakazu [the mother's friend] from her deposition, despite the fact it was hearsay and the fact that

Mr. Taylor [the mother's attorney] did not receive notice of the deposition.

48. Mr. Choi was routinely late to Court (for example, arriving after 10:00 am), both to begin in the mornings and returning from recesses. He also had been late and left early from arbitration.

Based on these findings, which are verities, the trial court concluded:

49. It appears to the Court that there has been a substantial change in circumstance since the Parenting Plan was entered by Judge Downing in December, 2015. Judge Downing's findings were critical of Mr. Choi in many respects, but they do not portray the man this Court observed or learned about from testimony and exhibits describing the several months after trial that the children were placed with him as the primary residential parent. Concerns about Mr. Choi's ability to feed and care for the children were not raised at the dissolution trial, and the children were living with him before that trial.

50. It appears to this Court that Mr. Choi was devastated by the denial of relocation to Hawaii and this may have caused him to fall apart. It would take a psychologist to determine if this theory is accurate, but it is nonetheless compelling. In any case, the children's lives deteriorated significantly after the trial. They were not adequately fed, they were punished with isolation from one another, threats to their beloved dog, and were living in a very dirty, disorganized home. They were not allowed to attend music lessons or practice their instruments.

. . . .

52. Since the dissolution trial, J.E.C. has been injured as a result of assaults by his father; his sisters witnessed the assault on May 18, 2016, during which J.E.C. attempted to protect his sisters.

53. There is no indication that any of these conditions were present prior to the dissolution trial; the primary focus of physical abuse at the dissolution trial was related to the

mother. These allegations have subsequently been disavowed.

54. By a preponderance of the evidence, this substantial change in circumstance is related to the father, who is the non-moving party. RCW 26.09.260(1).

55. The children's environment in his home is detrimental to their physical, mental, and emotional health. They have lived with their mother for almost two years now without seeing their father. It is plain that if any harm was caused by disrupting their placement with the father, it is far outweighed by the advantages of moving to their mother's care. The children have relaxed and begun to enjoy things like music again, as their violin teacher testified.

56. By a preponderance of the evidence presented, it is clearly in their best interest to have their primary residential placement switch to their mother's home.

57. While the children should see their father, it is apparent to the Court that they are disturbed by Mr. Choi's behavior, as well as frightened by the abuse they experienced in his care. No visits shall occur unless and until Mr. Choi participates in a comprehensive psychological evaluation by an evaluator named in the parenting plan. This evaluator must be prepared to come to Court to testify in person about their findings and recommendations. Given Mr. Choi's willingness to submit forged documents to the Court, the Court cannot rely on a written report alone.

These findings support the trial court's conclusions. The findings describe children in an environment detrimental to their needs. They also describe incidents of physical abuse. The findings state that the children's moods deteriorated during their time living with their father. The trial court found that Nathan's parenting changed for the worse after the court denied his relocation request. The trial court did not abuse its discretion by deciding that the best

interest of the children, at that point in time, justified modification of the parenting plan.[21]

Nathan asserts that the trial court abused its discretion because, he contends, Josephene's "allegations are clearly lies she created to usurp the parenting plan." But the trial court's findings support its conclusions, and the trial court did not base its findings on Josephene's allegations alone. The trial court relied on, among other things, the evidence provided in the GAL report and the trial testimony from multiple witnesses.

Nathan undermines his argument by generally failing to cite to the record and, when he does, cherry-picking paragraphs and citing to evidence unrelated to any issue before the court.[22] And he does not cite to any legal authority.[23] RAP 10.3(a)(5) and RAP 10.3(a)(6) require an appellant to support his arguments and factual statements with references to the record. "Where no authorities are cited in support of a proposition, the court is not required to search

---

[21] State v. Garcia, 45 Wn. App. 132, 140, 724 P.2d 412 (1986); State v. Slemmer, 48 Wn. App. 48, 57, 738 P.2d 281 (1987). In addition to failing to assign error to the findings, Nathan did not provide a complete record to allow this court to evaluate his claim. The appellant has the burden of providing a record sufficient to review the issues raised.

[22] For example, "Please look at Josephene Choi's business ad inviting illegal aliens to call her." These pages include an ad in Korean and the text of 8 U.S.C. § 1229b.

[23] His one citation in his opening brief, Daligcon v. Daligcon, is an unpublished opinion from this court.

out authorities, but may assume that counsel, after diligent search, has found none."[24]

In his reply brief, Nathan contends that collateral estoppel bars Josephene from raising the issue of putative assault of the children by Nathan. He cites no authority for his implied assertion that an acquittal on a criminal charge controls a factual determination in a civil proceeding with a lower burden of proof. We reject this contention as incorrect on its face.

### The Trial Court Did Not Abuse Its Discretion When It Denied Nathan's Motion for Change in Venue

Nathan challenges the trial court's denial of his request to change venue. He contends that he cannot receive a fair trial in King County. This court reviews a trial court's discretionary ruling on a request to change venue for abuse of discretion.[25] An abuse of discretion occurs when no reasonable person would adopt the trial court's position.[26]

RCW 4.12.030(2) authorizes a court to change venue "when it appears by affidavit, or other satisfactory proof [t]hat there is reason to believe that an impartial trial cannot be had therein."

---

[24] State v. Logan, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

[25] Hickey v. City of Bellingham, 90 Wn. App. 711, 719, 953 P.2d 822 (1998) (citing Baker v. Hilton, 64 Wn.2d 964, 965, 395 P.2d 486 (1964)).

[26] Mayer v. City of Seattle, 102 Wn. App. 66, 79, 10 P.3d 408 (2000).

Nathan provides no argument in his opening brief to support his claim.[27] He addresses it for the first time in his reply brief in the section titled "FURTHER P[RO]CEEDINGS SHOULD BE HELD IN A DIFFERENT VENUE BECAUSE THE EVIDENCE SHOWS THE KING COUNTY JUDIC[I]ARY IS BIAS[ED] AGAINST NATHAN CHOI." We do not consider issues addressed for the first time in a reply brief. And, even here, he does not cite legal authority or those parts of the record supporting his claim.[28]

Although he does not cite to it, the record does include his motion and affidavit. And these show that Nathan failed to offer satisfactory proof that an impartial trial on his claim could not be held in King County. In these filings, Nathan asserted, "The King County Judiciary is known to punish[ ] any attorney who runs against any of their members. This unfortunate culture is evident in the manner that Nathan Choi's case has been handled." He then lists his grievances with the trial court, some of which are the subject of his appeal. He provides no evidence that either the judge who heard his case or the other members of the King County Superior Court bench were not impartial. The trial court did not abuse its discretion when it denied his request to change venue.

---

[27] It appears that he originally intended to because the table of contents lists a section titled "Court should transfer this cause to Grant County." This section does not actually appear on the page to which he refers, and it does not appear anywhere else in the brief.

[28] Instead, he cites to appendices attached to the reply brief. The respondent did not file a motion to strike. We decline to review materials outside of the record.

Restraining Order

In his notice of appeal, Nathan identifies an April 13, 2018, restraining order as a subject of his appeal. But he does not assign error to it and does not discuss it in either of his briefs. Because he does not provide any argument supporting his appeal of this order, we decline to review it.

Attorney Fees

Josephene requests this court to award attorney fees. Because she did not comply with the requirements of RAP 18.1(b), we deny her request.

CONCLUSION

We affirm. Nathan does not establish that the trial court lacked the authority to modify the parenting plan. He does not show that the trial court abused its discretion when it modified the parenting plan or when it denied his request to change venue.

_Leach, J._

WE CONCUR:

_____    _Schindler, J_